UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL ASHLEY #136985,

      Plaintiff,

                             NO. 1:24-cv-31

v

                             MAG. RAY KENT

E'COE HILL, *et al.*,

      Defendants.

_____

## DEFENDANT MDOC AND DEFENDANT BLUE'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

*/s/ Ryanne E. Rizzo*
Assistant Attorney General
Attorney for Defendant Harbaugh
Corrections Division
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
Rizzor1@michigan.gov
Ryanne E. Rizzo (P83838)

Dated:  December 20, 2024

# TABLE OF CONTENTS

Page

Table of Contents....................................................................................................i

Index of Authorities..............................................................................................ii

Concise Statement of Issues Presented ...................................................vii

Statement of Facts................................................................................................1

Argument ..................................................................................................................5

I.     Summary Judgment Legal Standard...................................................6

II.    Eighth Amendment Claims ...................................................................8

       A.     The MDOC is entitled to Eleventh Amendment Immunity. ..................8

       B.     Ashley's Eighth Amendment claim against Blue fails as the
              requisite personal involvement does not exist. ......................................9

       C.     Ashley's Eighth Amendment claim also fails against Blue
              because he cannot satisfy the required elements of his medical
              deliberate indifference claim..................................................................... 11

              1.    Ashley cannot meet the objective component of his claim......... 13

              2.    Ashley cannot meet the subjective component of his claim....... 17

III.   Ashley's Americans with Disabilities Act and Rehabilitation Act claims
       fail against Blue and the MDOC. ....................................................... 19

       A.     Blue................................................................................................................. 19

       B.     The MDOC..................................................................................................... 20

IV.    Blue is entitled to qualified immunity. ............................................. 24

Conclusion and Relief Requested .................................................................. 25

# INDEX OF AUTHORITIES

Page

**Cases**

*Alexander v. CareSource,*
   576 F.3d 551 (6th Cir. 2009) ..................................................................... 7

*Allen v. MDOC,*
   No. 1:24-cv-736, 2024 U.S. Dist. LEXIS 132196, at *7-8 (W.D. Mich July 26,
   2024) ......................................................................................................... 22

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................... 6

*Anthony v. Swanson,*
   701 F. App'x 460, 464 (6th Cir. 2017) ...................................................... 13

*Barren v. Harrington,*
   152 F.3d 1193, 1194 (9th Cir. 1998) ......................................................... 9

*Barton v. Martin,*
   949 F.3d 938 (6th Cir. 2020) ..................................................................... 8

*Bevington v. Ohio Univ.,*
   93 F. App'x, 748, 750 (6th Cir. 2004) ...................................................... 19

*Blackmore v. Kalamazoo County,*
   390 F.3d 890, 899 (6th Cir. 2004) ...................................................... 13, 14

*Bletz v. Gribble,*
   641 F.3d 743 (6th Cir. 2011) ..................................................................... 7

*Bryant v. Madigan,*
   84 F.3d 246, 249 (7th Cir. 1996) .............................................................. 22

*Burger v. Bloomberg,*
   418 F.3d 882, 883 (8th Cir. 2005) ............................................................ 22

*Carten v. Kent State Univ.,*
   282 F.3d 391, 396-97 (6th Cir. 2002) ...................................................... 20

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ................................................................................... 6

*Comstock v. McCrary,*
  273 F.3d 693 (6th Cir. 2001) ............................................................... 12, 17

*Coston v. Corizon, Inc.,*
  No. 1:17-cv-249, 2018 U.S. Dist. LEXIS 169242, at *17 (W.D. Mich. Aug.
  29, 2018) ............................................................................................... 9

*Deshaney v. Winnebago County Dep't of Soc. Servs.,*
  489 U.S. 189 (1989) ............................................................................. 12

*Diaz v. Mich. Dep't. of Corr.,*
  703 F.3d 956, 969 (6th Cir. 2013) ........................................................ 8

*Dillery v. City of Sandusky,*
  398 F.3d 562, 567 (6th Cir. 2005) ........................................................ 20

*District of Columbia. v. Wesby,*
  138 S. Ct. 577 (2018) ........................................................................... 8

*Doe v. Salvation Army in U.S.,*
  531 F.3d 355, 358 (6th Cir. 2008) ........................................................ 20

*Doe v. Woodford Cnty. Bd. of Educ.,*
  213 F. 3d 921, 925 (6th Cir. 2000) ....................................................... 20

*Estelle v. Gamble,*
  429 U.S. 97 (1976) ........................................................................... 11, 12

*Fisher v. Harden,* 398 F.3d 837 (6th Cir. 2005) ....................................... 25

*Fitzgerald v. Corr. Corp. of Am.,*
  403 F.3d 1134, 1144 (10th Cir. 2005) ............................................... 22, 24

*Ford v. Jindal,*
  No. 19-cv-13207, 2023 U.S. Dist. LEXIS 177068, at *18-19 (E.D. Mich. Sep.
  30, 2023) ............................................................................................... 20

*Gregg v. Georgia,*
  428 U.S. 153 (1976) ............................................................................. 12

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ........................................................................... 7, 24

*Harrison v. Michigan,*
  722 F.3d 768, 777 (6th Cir. 2013) ........................................................ 8

*Huff v. TeleCheck Servs., Inc.*,
   923 F.3d 458 (6th Cir. 2019) ............................................................ 7

Humphrey v. Mabry,
   482 F. 3d 840 (6th Cir. 2007) ......................................................... 24

*Jackson v. Illinois Medi-Care, Inc.*,
   300 F.3d 760 (7th Cir. 2002) ......................................................... 12

*Kensu v. Rapelje*,
   2015 U.S. Dist. LEXIS 120423, 1t *9-10 (E.D. Mich. Sept. 10, 2015) ................... 23

*Lapides v. Bd. of Regents*,
   535 U.S. 613,122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002) ........................... 9

*Lee v. Mich. Parole Bd.*,
   104 F. App'x, 490, 493 (6th Cir. 2004) ................................................ 19

*Martin v. Warren Cty.*,
   799 F. App'x 329, 338 (6th Cir. 2020) ......................................... 13, 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ....................................................................... 6

*McCoy v. Michigan*,
   369 F. App'x 646, 653-54 (6th Cir. 2010) ......................................... 8

*Miller v. Calhoun County*,
   408 F.3d 803, 819 (6th Cir.) ........................................................ 12

*Minley v. Pierce*,
   2019 U.S. Dist. LEXIS 184829, 2019 WL 5485235, at *3 (W.D. Mich., Oct.
   25, 2019) .................................................................................. 9

*Morrissey v. Laurel Health Care Co.*,
   946 F.3d 292, 299 (6th Cir. 2019) ................................................ 21

*Mullenix v. Luna*,
   577 U.S. 7 (2015) ......................................................................... 8

*Nottingham v. Richardson*,
   499 F. App'x 368, 377 (5th Cir. 2012) ............................................ 22

*Pa. Dep't. of Corr*,
   524 U.S. 206, 118 S. Ct. 1952, 141 L. ED. 2d 215 (1998) ...................... 19

iv

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ................................................................. 7, 24

*Phillips v. Roane Cty.,*
    534 F.3d 531 (6th Cir. 2008) ........................................................ 7

*Powell v. Columbus Med. Enterprises, LLC,*
    No. 21-3351, 2021 U.S. App. LEXIS 36781, 2021 WL 8053886, at *2 (6th
    Cir. Dec. 13, 2021) ................................................................. 22

*Rhinehart v. Scutt,*
    894 F.3d 721, 737 (6th Cir. 2018) ........................................ 12, 13, 16

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) .................................................................. 11

*Rich v. City of Mayfield Heights,*
    955 F.2d 1092 (6th Cir. 1992) ..................................................... 24

*Salehpour v. Univ. of Tenn.,*
    159 F.3d 199, 206 (6th Cir. 1998) ................................................. 9

*Self v. Crum,*
    439 F.3d 1227 (10th Cir. 2006) ................................................... 16

*Smith v. Sator,*
    102 F. App'x 907, 909 (6th Cir. 2004) ........................................... 25

*Stevenson v. Pramstaller,*
    No. 07-14040, 2008 U.S. Dist. LEXIS 106448, recommendation adopted,
    No. 07-14040, 2009 U.S. Dist. LEXIS 25495, 2009 WL 804748 (E.D. Mich.
    Mar. 24, 2009) ..................................................................... 23

*United States v. Univ. Hosp.,*
    729 F.2d 144, 157 (2d Cir. 1984) ................................................. 22

*Warman v. Marberry,*
    No. 05-10138, 2008 U.S. Dist. LEXIS 53432, at *15 (E.D. Mich. July 14,
    2008) ............................................................................... 13

*Westlake v. Lucas,*
    537 F.2d 857, 860 n.6 (6th Cir. 1976) ........................................... 16

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58, 109 S. Ct. 2304, 2311 (1989) ....................................... 8

*Williams v. Maurer,*
    9 F.4th 416 (6th Cir. 2021) ........................................................................ 8

*Wilson v. Seiter,*
    501 U.S. 294, 111 S. Ct. 2321, 2326 (1991) ............................................ 17

**Statutes**

29 U.S.C §794(a) ............................................................................................ 19

42 U.S.C. § 1983 ........................................................................................ vii, 9

**Other Authorities**

Americans with Disabilities Act (ADA) ............................................... vii, 1, 19

U.S. Const. amend. VIII ................................................................................ 11

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................ 6

Fed. R. Civ. P. 56(e). ........................................................................................ 7

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Under the Eleventh Amendment, state departments and divisions are immune from federal lawsuits.  Where the Sixth Circuit has specifically held that the MDOC is absolutely immune from §1983 lawsuits under the Eleventh Amendment, is the MDOC entitled to summary judgment on any Eighth Amendment claims brought against it?

2.    A plaintiff must make a clear showing that each named defendant was personally involved in the activity that forms the basis of the complaint.  Liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon "a mere failure to act."  Plaintiff has not sufficiently alleged personal involvement of Blue to impose liability against her under 42 U.S.C. § 1983. Is Blue entitled to summary judgment?

3.    A claim under the Eighth Amendment for deliberate indifference requires a showing by the plaintiff that there exists an objectively serious medical need and that the defendant had the requisite knowledge of the risk of harm to plaintiff's health and disregarded that risk.  Where Defendant Blue can show plaintiff received frequent medical care wherein Plaintiff's claim ultimately amounts to a disagreement with treatment he received, should this Court grant summary judgment in favor of Blue on Plaintiff's Eighth Amendment claim?

4.    The Americans with Disabilities Act (ADA) prohibits discrimination against disabled individuals by a "public entity" and the Rehabilitation Act (RA) prohibits an "entity" that receives federal funding from engaging in disability discrimination.  Where Blue is not an "entity" and was sued in her individual capacity, should this Court grant summary judgment in favor of Blue on Plaintiff's ADA and RA claims?

5.    Where the alleged "discrimination" that occurred is really just plaintiff's dissatisfaction with his medical treatment there can be no RA or ADA violation.  As Plaintiff's complaints are about his medical treatment is the MDOC entitled to summary judgment on Plaintiff's RA and ADA claims?

6.    Officials sued in their individual capacities are shielded from liability when their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would have known.  Plaintiff has failed to show that Blue violated clearly established statutory or constitutional rights. Should this Court grant summary judgment in favor of Blue because she is entitled to qualified immunity?

## STATEMENT OF FACTS

Plaintiff, Carl Ashley #136985, is currently a prisoner confined with the Michigan Department of Corrections (MDOC), at the Muskegon Correctional Facility.   (Ex. A, OTIS face sheet.)  The events of which Plaintiff complains occurred at Lakeland Correctional Facility (LCF).  (Am. Compl., ECF No. 10.)

### Procedural History

Ashley filed suit against numerous defendants, including E'Coe Hill, Heather Doolittle, Jacob Clapper, Lori Blue, Dr. Rickey Coleman and the MDOC.  (Am. Compl., ECF No. 10.)

Plaintiff has made allegations of Eighth Amendment deliberate indifference to a serious medical condition along with claimed violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA).  (Am. Compl., ECF No. 10, PageID.109-110.)  Ashley's Eighth Amendment claims against Blue center on one date of service, July 29, 2021, alleging she failed to treat an alleged urinary tract infection.  (Ex. B, Ashley dep. tr., p. 19:15-25. p. 23:14-16.) Ashley's ADA and RA claims center on his medical provider prescribing eight (8) urostomy changes per month instead of the ten (10) he wanted.  (Ex. B, Ashley dep. tr., p. 27:23-25-28:1-9.)

### Ashley's urinary tract infection complaints

Ashley has been incarcerated with the Michigan Department of Corrections since 1976 (Exhibit A, OTIS face sheet) and has faced a litany of health issues since. In May 2015, Ashley received a bladder cancer diagnosis.  (Exhibit B, Ashley dep. tr., p. 40:9-14.)  After that diagnosis Ashley underwent eight (8) weeks of chemotherapy and then in January 2016 had his bladder and his prostate removed.

1

(Ex. B, Ashley dep. tr., p. 40:18-21.)  As a result of having his bladder removed Ashley began requiring use of a urostomy bag.  (Ex. B, Ashley dep. tr. p. 40:23-25.) Following these surgeries, and the implementation of the urostomy bag, Ashley began experiencing frequent symptoms that he associated with a urinary tract infection (UTI).  (Ex. B, Ashley dep. tr., p. 14:7-12; Exhibit C, Ashley medical records, p. 39.)   As a result of the treatment for frequent UTIs Ashley became resistant to antibiotics and as such was sent to the Duane Waters Health Center on October 20, 2023, so he could be treated with IV antibiotics.  (Ex. C, Ashley medical records, pp. 3-5.)  However, when he arrived at Duane Waters, Ashley did not present with a unstable lab results.  *Id.*  As such it was determined that Ashley likely had bacteriuria and that the symptoms he was experiencing were related to something other than the bacteria in his urine.  *Id.*   On December 29, 2020, Ashley's treating medical provider again informed him that he had become resistant to antibiotics and ordered that no more urinalyses should be run, or antibiotics be prescribed, without the presence of a fever and elevated white blood cell count (wbc).  (Ex. B, Ashley dep. tr. p. 14:7-23, Ex. C, Ashley medical records, pp.17-19.)

In 2021 Ashley continued to present to healthcare for urinary tract infection symptoms and was angry that healthcare would not give him antibiotics because he did not have a fever and elevated wbc.  (Ex. C, Ashley medical records pp. 21-52.) On July 9, 2021, Ashley wrote a kite to healthcare requesting to once again be seen for urinary tract infection symptoms.  (Ex. C, Ashley medical records, p. 47.)  Ashley was called out to see nursing staff on the same day he sent the kite, July 9, 2021,

and encountered Defendant Blue at this visit.  (Ex. C, Ashley medical records, pp. 30-34; Exhibit D, Blue aff.)  Blue is a registered nurse (RN).  (Ex. D, Blue aff.)  When Blue spoke with Ashley on July 9, he denied having chills or a fever and refused to be seen by nursing; instead demanding to see a medical provider.  (Ex. C, Ashley medical records pp. 30-34; Ex. D, Blue aff.)  Blue told him that he had an upcoming appointment scheduled with his medical provider but that at this appointment only she, an RN, was available to see him.  (Ex, D, Blue aff.)  As an RN, all Blue was able to do for Ashley was to take his vitals, ask him about his subjective complaints and then send any abnormal findings onto a medical provider for evaluation.  (*Id.*)  However, upon hearing this information, Ashley refused to have his vitals taken or be seen by Blue and left healthcare with instructions given by Blue that he make sure to return should he develop a fever.  (Ex. C, Ashley medical records pp. 30-34; Ex. D, Blue aff.)

After this encounter with Blue, Ashley never required hospitalization for his symptoms, never developed a fever and his symptoms remained the same.  (Ex. B, Ashley dep. tr., p. 21:7-25-22:1-25; Ex. C, Ashley medical records, pp. 53-54; Ex. F, Cleveland clinic fever guide, https://my.clevelandclinic.org/health/symptoms/10880-fever, last accessed December 6, 2024.[1])  This one date of service, July 9, 2021, is the one and only date of service that Ashley complains of against Blue.  (Ex. B, Ashley dep. tr., p. 23:14-16.)

---

[1] Cleveland clinic citation outlines what temperature is considered to be a fever.

**<u>Urostomy Supplies</u>**

Ashley was prescribed eight (8) urostomy changes per month and that is what he received while he was at LCF. (Ex. C, Ashley medical records, pp. 20-21, 29, 36-37.) The University of Chicago Medicine recommends changing urostomy pouches twice a week, which is in line with the eight (8) changes per month that Ashley received. (Exhibit E, University of Chicago Medicine, https://www.uchicagomedicine.org/conditions-services/colon-rectal-surgery/ostomy/guide-to-pouching-systems/how-to-use-a-pouching-system, last accessed December 5, 2024). While it was explained to Ashley that he was inadvertently given more urostomy supplies than he was supposed to receive in the past, he was upset that he did not continue to receive that same amount. (Ex. B, Ashley dep. tr. p. 13:1-16; Ex. C. Ashley medical records, pp. 20-21, 29, 36-37.) Ashley is scheduled for daily care to get his urostomy supplies checked, emptied and cleaned. (Ex. C, Ashley medical records, pp. 40, 55-76.) Further, he has been told that if he develops a leak, or runs out of supplies, he just needs to let healthcare know and he will be given what he needs. (Ex. B, Ashley dep. tr., p. 13:4-20; Ex. C, Ashley medical records, pp. 20-21, 29, 36-37.) Despite knowing he could call healthcare at any time if he developed a leak or ran out of supplies, Ashley demanded that healthcare automatically give him ten (10) changes per month instead of eight (8) which was not in line with what his medical providers had ordered. (Ex. C., Ashley medical records, pp. 20-21, 29, 36-37.)

Ashley claims that he is disabled for purposes of his ADA and RA claims because he is disfigured due to having his bladder removed.  (Ex. B, Ashley dep. tr., p. 23:20-25-24:1.)  The only activity or program Ashley claims to have been unable to participate in was walking for exercise in the yard.  *Id.* at 24:1-25.  However, it was not his disability that prevented him from walking, but instead he decided to self-limit his activity due to only having eight (8) urostomy changes per month rather than the ten (10) he wanted.  (*Id.* at 24:1-25.)  No doctor ever limited Ashley's walking.  (*Id.* at 25:8-10.)  Ashley's urostomy bags never actually leaked through and he never actually ran out of supplies.  (*Id.* at 16:11-17.)  Further, once Ashley began getting ten (10) urostomy changes per month again, he says he decided to once again begin walking for exercise.  (*Id.* at 26:1-4.)

When asked how the MDOC discriminated against him, the only way Ashley articulated was that they failed to accommodate his missing bladder because his medical provider was only providing him with only eight (8) urostomy changes per month instead of ten (10).  (*Id.* at 27:23-25-28:1-9.)

Ashley's claims against Defendant RN Lori Blue and the Michigan Department of Corrections center on these two medical issues: (1) his frequent UTIs and how they were treated and (2) his getting eight (8) instead of ten (10) urostomy changes per month for a period of time.

## ARGUMENT

Ashley's claims against Blue and the MDOC should be dismissed as his claims fail as a matter of law.  Additionally, Blue is entitled to the protections of

qualified immunity.  For the reasons discussed below, this lawsuit should be dismissed with prejudice.

## I.    Summary Judgment Legal Standard

Fed. R. Civ. P. 56(a) provides that a court "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The main inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Although the evidence must be viewed in the light most favorable to the non-moving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Thus, in order to survive summary judgment, the non-moving

party "must set forth specific facts showing that there is a genuine issue for trial."
*Anderson,* 477 U.S. at 250; Fed. R. Civ. P. 56(e).  To sustain this burden, the
nonmoving party may not rest on the mere allegations of his pleadings.  *Huff v.
TeleCheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019).  "Conclusory statements
unadorned with supporting facts are insufficient to establish a factual dispute that
will defeat summary judgment." *Alexander v. CareSource,* 576 F.3d 551, 560 (6th
Cir. 2009).

"Under the doctrine of qualified immunity, 'government officials performing
discretionary functions, generally are shielded from liability for civil damages
insofar as their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known.'" *Phillips v.
Roane Cty.,* 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457
U.S. 800, 818 (1982)).  In making a qualified immunity determination, a court must
decide whether the facts as shown make out a constitutional violation or whether the
right that was allegedly violated was a clearly established right at the time of the
alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).  If a court
can conclude that either no constitutional violation occurred or that the right was
not clearly established, qualified immunity is warranted. *Id.*  A court may consider
either approach without regard to sequence. *Id.*

Once a defendant raises a qualified immunity defense, "the plaintiff bears
the burden of showing that a defendant is not entitled to qualified immunity."
*Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citation omitted).  Although

when ruling on a summary judgment motion, a court must view the factual evidence and draw all reasonable inferences in favor of the non-moving party, "when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right." *Williams v. Maurer,* 9 F.4th 416, 430 (6th Cir. 2021) (citing *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020)).

For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). "The 'clearly established' standard also requires that the legal principle clearly prohibit the [defendant's] conduct in the particular circumstances before him" with a high "degree of specificity." *District of Columbia. v. Wesby*, 138 S. Ct. 577, 590 (2018) (citing *Mullenix,* 577 U.S. at 13).

## II.    Eighth Amendment Claims

### A.    The MDOC is entitled to Eleventh Amendment Immunity.

Under the Eleventh Amendment, State departments or subdivisions are immune from federal lawsuits. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 69, 109 S. Ct. 2304, 2311 (1989). The Sixth Circuit has specifically held that the MDOC is absolutely immune from §1983 lawsuits under the Eleventh Amendment. *Harrison v. Michigan*, 722 F.3d 768, 777 (6th Cir. 2013); *Diaz v. Mich. Dep't. of Corr.*, 703 F.3d 956, 969 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Minley v. Pierce*, 2019 U.S. Dist. LEXIS 184829, 2019 WL

5485235, at *3 (W.D. Mich., Oct. 25, 2019).  In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under §1983 for money damages.  *Lapides v. Bd. of Regents*, 535 U.S. 613, 617, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002).  Plaintiff only seeks money damages as relief in this matter (*see* ECF No. 10, PageID.110-111), as such any Eighth Amendment claims Ashley has asserted against the MDOC should be dismissed with prejudice.

### B.    Ashley's Eighth Amendment claim against Blue fails as the requisite personal involvement does not exist.

The requisite personal involvement of RN Blue, in the alleged deficient medical treatment, does not exist, and therefore she cannot be held liable.  For Defendants to be held liable for alleged §1983 violations, Ashley has to allege "that they did more than play a passive role in the alleged violation..." *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998).  "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under §1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  It is not within the scope of practice for a registered nurse to diagnose conditions or prescribe medications. Such changes can only be made by higher-level medical care providers.  *Coston v. Corizon, Inc.,* No. 1:17-cv-249, 2018 U.S. Dist. LEXIS 169242, at *17 (W.D. Mich. Aug. 29, 2018).

Ashley's entire claim against Blue centers on one date of service – July 9, 2021.  (Ex. B, Ashley dep. tr., p. 23:14-16.)  Prior to the July 9, 2021, date of service with Blue, Ashley had a long history of health issues, including having multiple

complaints of UTIs that were treated and resulted in his becoming resistant to antibiotics.  (Ex. B, Ashley dep. tr., p. 14:7-12; Ex. C, Ashley medical records.)

On July 9, 2021, Ashley kited to healthcare that he was angry about having pain that he associated with UTI symptoms and said, "I am requesting that you order treatment for this ongoing painful condition."  (Ex. C, Ashley medical records, p. 47.)  RN Blue then saw Ashley later that day to evaluate his condition.  (Ex. C, Ashley medical records, pp. 30-34; Ex. D., Blue aff.)  Nurse Blue began to get some information from Ashley, who denied being feverish or having chills.  (Ex. C, Ashley medical records, pp. 30-34; Ex. D., Blue aff.)  However, Ashley was upset that Blue was only a nurse as he wanted to see a medical provider, saying "nursing will do nothing for him".  (Ex. C, Ashley medical records, pp. 30-34; Ex. D., Blue aff.)  There were no medical providers available to see Ashley at the time and he had an upcoming appointment scheduled with a nurse practitioner.  (Ex. C, Ashley medical records, pp. 30-34; Ex. D., Blue aff.)  Upset he could not see a medical provider, Ashley left without Blue being able to do an assessment.  (Ex. C, Ashley medical records, pp. 30-34; Ex. D., Blue aff.)

Ashley must show that Blue "did more than play a passive role in the alleged violation..." (*Salehpour*, 159 F.3d at 206) to hold Blue liable under §1983.  Here, Ashley is upset he wasn't getting the type of treatment he wanted for his UTI symptoms.  (Ex. C, Ashley medical records, p.; Ex. D., Blue aff.)  Blue is a nurse who is only able to take vitals and report any abnormal findings to a medical doctor.  (Ex. D, Blue aff.; *Coston,* No. 1:17-cv-249, 2018 U.S. Dist. LEXIS 169242, at *17.

10

Blue attempted to take vitals and do what was in her power to assist Ashley in his medical discomfort, but upon hearing that only nursing was able to see him, Ashley refused treatment and left.  (Ex. C, Ashley medical records, pp. 30-34; Ex. D., Blue aff.)  That is the extent of Ashley's complained interaction with Blue.  As such, the requisite personal involvement of Blue is fatally missing from the case and summary judgment in her favor is appropriate.

   **C.    Ashley's Eighth Amendment claim also fails against Blue because he cannot satisfy the required elements of his medical deliberate indifference claim.**

As discussed, Ashley's deliberate indifference claim against Blue centers completely on one date of service, July 9, 2021.  (Ex. B, Ashley dep. tr., p. 23:14-16.)  On this date Ashley was looking for treatment of what he believed to be UTI symptoms.  (Ex. B, Ashley dep. tr, p.19:15-25; Ex. C, Ashley medical records, pp. 30-34, 47.)  He argues that Blue's failure to take his vitals on July 9, 2021, violated his right to be free from cruel and unusual punishment under the Eighth Amendment.  (Ex. B, Ashley dep. tr, p. 36:12-19.)

The Eighth Amendment prohibits cruel and unusual punishments.  U.S. Const. Amend. VIII.  It is well-established that cruel and unusual punishment under the Eighth Amendment includes the unnecessary and wanton infliction of pain.  *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).  Deliberate indifference to a prisoner's serious medical need can give rise to the unnecessary and wanton infliction of pain.  *Id.*  Cruel and unusual punishment also includes deprivation of the minimal civilized measure of life's necessities.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Thus, prisoners must be provided basic life necessities, such as

adequate food, clothing, shelter, and medical care.  *Deshaney v. Winnebago County Dep't of Soc. Servs.*  489 U.S. 189, 199-200 (1989).

As it pertains to medical care or treatment, it is only the "deliberate indifference to serious medical needs of prisoners" which constitutes the "unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  An Eighth Amendment claim has an objective component and a subjective component.  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

When an inmate has received on-going treatment for his condition yet claims that this treatment was inadequate, the objective component requires him to show medical care that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Miller v. Calhoun County*, 408 F.3d 803, 819 (6th Cir.)  The plaintiff must present enough evidence for a factfinder to gauge the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment.  *Rhinehart* at 737.  The plaintiff must place verifying medical evidence in the record to establish the detrimental effect of the inadequate treatment. *Id.*  The denial of medical treatment satisfies the deliberate indifference standard only if significant harm or injury is shown.  *Jackson v. Illinois Medi-Care, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002).  Further, plaintiff's proof often requires "expert medical testimony . . . showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received.

*Rhinehart* at 737-38 (*quoting Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017).

The subjective component requires a showing that the defendant's state of mind was sufficiently culpable as to evidence an intent to punish; that is, a plaintiff must show that a defendant was aware of and disregarded an excessive risk to the plaintiff's health or safety; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Ashley cannot satisfy the objective or subjective element of his deliberate indifference claim against Blue. Ashley has not suffered any medical injuries, he was repeatedly afforded medical treatment, and his medical complaints were responded to during the relevant period. As to the care that was provided, nothing in the record shows Blue provided grossly inadequate care. Likewise, Blue did not know of and consciously disregard a substantial risk of serious harm to Ashley.

## 1.    Ashley cannot meet the objective component of his claim.

To satisfy the objective portion of an Eighth Amendment claim plaintiff must allege that the medical need asserted is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). "When a serious medical need is obvious, a plaintiff does not need to provide verifying medical evidence of harm." *Martin v. Warren Cty.*, 799 F. App'x 329, 338 (6th Cir. 2020) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004), *see also Warman v. Marberry*, No. 05-10138, 2008 U.S. Dist. LEXIS 53432, at *15 (E.D. Mich. July 14, 2008)). "But when a serious medical need is not obvious and 'is based

on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious,' plaintiffs must supply medical proof of injury at summary judgment so that we are able 'to assess whether the delay [in adequate medical care] caused a serious medical injury.'" *Id.* at 388 (quoting *Blackmore*, 390 F.3d 890, 899 citing *Napier*, 238 F.3d 739 at 742.

While Blue does not deny that a urinary tract infection in and of itself could, in some instances, constitute a serious health condition, here Ashley brings suit over Blue's alleged failure to adequately treat his condition, and as such, Ashley "must supply medical proof of injury at summary judgment . . ." *Martin v. Warren Cty.*, 799 F. App'x 329, 338 (6th Cir. 2020). Generally, this required medical proof must be in the form of expert testimony. *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021). While Ashley says he may call two (2) doctors who have treated him, he has not submitted any expert testimony from them or even any medical records from them that would support that nurse Blue's treatment on July 9, 2021, was in any way inadequate or caused Ashley any harm. (Ex. B, Ashley dep. tr., p. 23:14-16, p. 35:12-25.) Going further, Ashley has no medical proof of injury. Ashley complains of only one date of service with nurse Blue, July 9, 2021. (Ex. B, Ashley dep. tr., p. 23:14-16.) Prior to that date of service with Blue, Ashley had experienced more than twenty-five (25) UTIs. (Ex. C, Ashley medical records, p. 39.) Because Ashley had treated these UTIs with antibiotics so many times prior to his visit with Blue, he had become antibiotic resistant, and his healthcare provider ordered that he not have urinalysis run or be given antibiotics unless he had a fever

14

and an increased wbc.   (Ex. C, Ashley medical records, pp. 17-19.)  When Ashley

showed up to see Blue on July 9, 2021, she tried to evaluate him as much as she

could in her limited role as an RN.  (Ex. D, Blue aff.)  Blue noted that Ashley did not

have a fever or chills and when he demanded to see a doctor who could treat him

right then, she told him one was not available and reminded him that he had an

upcoming appointment scheduled to discuss his chronic UTI complaints.  (Ex. C,

Ashley medical records, pp. 30-34.) When he was told he couldn't see a medical

provider he refused to be assessed and left healthcare.  (Ex. C, Ashley medical

records, pp. 30-34; Ex. D, Blue aff.)

While Ashley will argue that he is "pretty sure" he had a fever the day he

presented to see Blue and will argue that he had a fever the next time he treated

with healthcare, there is no evidence of this.  In fact, the records show quite the

opposite.  Three days after his visit with Blue, on July 12, 2021, Ashley visited

healthcare again and his temperature was 97.8.  (Ex., Ashley medical records p. 53.)

On July 19, 2021, it was 97.7 and on July 29, 2021, it was 97.6.  (*Id*.)  In 2021

Ashley had his temperature taken thirty-five (35) times and not once did he have a

fever.  (Ex. C, Ashley medical records, pp. 53-54; Ex. F, Cleveland clinic fever guide,

https://my.clevelandclinic.org/health/symptoms/10880-fever, last accessed December

6, 2024.) Ashley never required hospitalization for his self-diagnosed UTI

symptoms. (Ex. B, Ashley dep. tr., p. 21:7-25-22:1-25) and when asked about what

harm he suffered due to Blue's alleged failure to treat him, Ashley admits that

nothing changed before, during or after the appointment with Blue - his symptoms remained the same.  (Ex. B, Ashley dep. tr., p. 36:20-25.)

Following his July 9, 2021, encounter with Blue, Ashley had multiple follow up visits with healthcare where he continued to complain of UTI symptoms and the healthcare staff continued to treat Ashley, just not in the way he wanted them to. (Ex. C, Ashley medical records, pp. 20-29, 43-47.)  "When 'a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted.'" *Rhinehart*, 894 F.3d at 743 (citing *Self v. Crum*, 439 F.3d 1227, 1232-33 (10th Cir. 2006)).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.6 (6th Cir. 1976).  "Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all."  But that was not the case here.  Here Ashley has had chronic UTIs to the point that he has become resistant to the antibiotics used to treat them. (Ex. C, Ashley medical records, pp. 2-4, 17-19, 24, 42.)  Ashley's treating providers ordered no urinalysis or antibiotics be given unless a fever and high wbc present. (Ex. C, Ashley medical records, pp. 17-19.)  Ashley was continuously monitored by healthcare both before and after his encounter with Blue and was given treatment consistent with these orders.  (Ex. C, Ashley medical records.)  While Ashley may

not agree with his medical provider's treatment plan, he was being treated, and Blue did not exhibit a deliberate indifference to his medical needs.

Ashley received continued medical treatment for his chronic UTI condition both before and after his brief encounter with Blue. He can produce no medical evidence that will provide support that Blue's actions caused him any injury; as such, Ashley cannot prove the objective prong of his Eighth Amendment claim against Blue.  Accordingly, Blue respectfully requests summary judgment be granted in her favor.

### 2.    Ashley cannot meet the subjective component of his claim.

Ashley is similarly unable to prove the subjective component of his claim against Blue.  To prove the subjective component, the plaintiff must show that the defendant possessed a sufficiently culpable state of mind, criminal recklessness, in allegedly depriving appropriate and sufficient medical care.  *Santiago v. Ringle,* 734 F.3d 585, 591 (6th Cir. 2013).  The subjective component requires a showing that prison officials knew of, and acted with deliberate indifference to, an inmate's health or safety.  *Wilson v. Seiter,* 501 U.S. 294, 302, 111 S. Ct. 2321, 2326 (1991). To demonstrate deliberate indifference, a plaintiff must show that the defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer,* 511 U.S. at 837).

In this case Blue is a registered nurse who briefly encountered Ashley on just one occasion that he complains of.  (Ex. B, Ashley dep. tr., p. 23:14-16; Ex. D, Blue

aff.)  Ashley has chronic UTIs for which his medical provider ordered no urinalysis be run and no antibiotics be given unless he presented with a fever and elevated wbc.  (Ex. C, Ashley medical records, pp. 17-19.)  Blue asked Ashley about his symptoms and he denied having chills or a fever but demanded to see a medical provider as Blue was just an RN.  (Ex. C, Ashley medical records, pp. 30-34.; Ex. D, Blue aff.)  There were no medical providers available and Blue reminded Ashley that he had an upcoming appointment already scheduled.  (Ex. B, Ashley dep. tr., p. 22:9-16; Ex. C, Ashley medical records, pp. 30-34; Ex. D, Blue aff.)  Ashley refused any further evaluation with Blue and left before she was able to perform vitals. (Ex. C, Ashley medical records, pp. 30-34; Ex. D, Blue aff.)

The subjective component requires that Ashley show that Blue knew of, and acted with deliberate indifference to, an inmate's health or safety.  *Wilson,* 501 U.S. 294 at 302.  That is not the case here.  While Ashley may be angry that Blue was unable to do more for him at that July 9, 2021, visit, that is not enough to meet the subjective requirement.  What Ashley is required to show is that Blue act with criminal recklessness.  *Santiago,* 734 F.3d 585 at 591.  Here, Blue listened to Ashley's complaints where he denied a fever or chills, explained there were no medical providers available to see him, reminded him of his upcoming appointment, provided education to Ashley to come back to healthcare if he developed a fever, and then Ashley left, upset that no medical provider could see him right then.  (Ex. B, Ashley dep. tr., p. 22:9-16; Ex. C, Ashley medical records, pp. 30-34; Ex. D, Blue aff.) While Blue could have taken Ashley's vitals if he had allowed her to, he refused and

left.  (Ex. C, Ashley medical records, pp. 30-34; Ex. D, Blue aff.)  Even if she had taken his vitals there is no evidence that Ashley had a fever that day and all of his temperature checks in the months preceding and following his appointment were within normal, healthy limits.   (Ex. C, Ashley medical records, pp. 53-54; Ex. F, Cleveland clinic fever guide, https://my.clevelandclinic.org/health/symptoms/10880-fever, last accessed December 6, 2024.)  There was no criminal recklessness here. Ashley told Blue he had no fever or chills and then he left healthcare without having his temperature checked.  (Ex. C, Ashley medical records, p. 30-34; Ex. D, Blue aff.)  And even accepting Ashley's claim that Blue refused to take his vitals, Ashley can produce no medical evidence that such action led to any detrimental effect.  As such, Blue requests summary judgment be granted in her favor.

III.   **Ashley's Americans with Disabilities Act and Rehabilitation Act claims fail against Blue and the MDOC.**

   A.   **Blue**

   Ashley alleges in his amended complaint that all named Defendants violated his rights under the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA).  (Am. Compl., ECF No. 10, PageID.109 at ¶80.)  The RA prohibits an *entity* that receives federal funding from engaging in disability discrimination.  *See* 29 U.S.C §794(a). The Supreme Court has held that the ADA applies to state prisons and inmates, *Pa. Dep't. of Corr,* 524 U.S. 206, 210-12, 118 S. Ct. 1952, 141 L. ED. 2d 215 (1998).  However, it is well-settled that individuals cannot be sued under the RA or the ADA.  *Bevington v. Ohio Univ.*, 93 F. App'x, 748, 750 (6th Cir. 2004);  *See also Lee v. Mich. Parole Bd.*, 104 F. App'x, 490, 493 (6th Cir. 2004)

19

("[N]either the ADA, nor the [Rehabilitation Act] impose liability upon individuals); *Carten v. Kent State Univ.*, 282 F.3d 391, 396-97 (6th Cir. 2002) (The proper defendant in an ADA case is a public entity or an official acting in his official capacity). Here Ashley has sued Blue only in her individual capacity and as such she cannot be held liable under the ADA or the RA. (Am. Compl., ECF No. 10, PageID.89 at ¶6.)

### B.    The MDOC

With respect to the MDOC, Ashley likewise cannot state a valid ADA or RA claim. ADA and RA claims are evaluated similarly. *Doe v. Woodford Cnty. Bd. of Educ.*, 213 F. 3d 921, 925 (6th Cir. 2000) To establish an ADA violation, Ashley must show that (1) he has a disability; (2) he is otherwise qualified to receive the benefit or service at issue; and (3) he is being excluded from participation in, being denied the benefit of, or being subjected to discrimination in the provision of, the services, programs, or activities of the public entity because of his disability. *See Dillery v. City of Sandusky*, 398 F.3d 562, 567 (6th Cir. 2005). The Rehabilitation Act requires that a plaintiff show "(1) that he is disabled; (2) that he was otherwise qualified ...; (3) that he was excluded solely by reason of his disability; (4) and that the relevant program is receiving federal financial assistance." *Ford v. Jindal*, No. 19-cv-13207, 2023 U.S. Dist. LEXIS 177068, at *18-19 (E.D. Mich. Sep. 30, 2023), *quoting Doe v. Salvation Army in U.S.*, 531 F.3d 355, 358 (6th Cir. 2008). While the Rehabilitation Act's causation standard differs from the ADA's, courts still frequently analyze together claims brought under the two statutes. *Ford* at 18-19.

20

Ashley cannot even meet the first prong of the test as he is not "disabled."  A "disability" under the ADA is defined as a physical or mental impairment that substantially limits one or more major life activities.  *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019).  Here, Ashley alleges his disability to be "disfigurement" from having his bladder removed.  (Ex. B, Ashley dep. tr., p. 23:20-24.)  Ashley claims that he is unable to walk for exercise, but not because of his "disability," rather because he has chosen to self-limit his walking for exercise due to a dispute with healthcare on how many urostomy bags he was being prescribed each week.  (Ex. B, Ashley dep. tr. 24:1-25.)  More evidence, that it is not a "disability" that impacted Ashley's ability to walk for exercise, is the fact that Ashley was never limited by a doctor in his ability to walk and admits that he personally made the choice not to exercise due to a dispute with his healthcare providers over how many urostomy supplies he got each week.  (Ex. B, Ashley dep. tr., p. 25:1-19.)  Additionally, Ashley has no evidence that he walked less at any point in time but says he has now made the choice to walk for exercise more as he is now receiving additional medical supplies.  (*Id.* at 26:4-18.)  Ashley is not disabled for purposes of the RA or the ADA as he does not have any disability that substantially impacts his ability to participate in any major life activity.  What Ashley actually has is a disagreement with healthcare over how many medical supplies he was receiving.  As such, Ashley is not disabled for the purposes of the ADA and summary judgment is appropriate.

21

Even if the Court decides Ashley is disabled for purposes of the ADA, he has not alleged he is being excluded from participation in or being denied the benefit of any prison programs, services, or activities because of his disability.  Rather, he claims that he is being denied proper medical care for his medical condition.  Such challenges to the extent or quality of the medical care he received do not state a claim under the ADA.  "Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say . . . that a particular decision was 'discriminatory.'"  *United States v. Univ. Hosp.*, 729 F.2d 144, 157 (2d Cir. 1984).  "Indeed, that distinction explains why the ADA is not an appropriate federal cause of action to challenge the sufficiency of medical treatment because '[t]he ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'"  *Allen v. MDOC*, No. 1:24-cv-736, 2024 U.S. Dist. LEXIS 132196, at *7-8 (W.D. Mich July 26, 2024), *citing Nottingham v. Richardson*, 499 F. App'x 368, 377 (5th Cir. 2012); *see also Powell v. Columbus Med. Enterprises, LLC*, No. 21-3351, 2021 U.S. App. LEXIS 36781, 2021 WL 8053886, at *2 (6th Cir. Dec. 13, 2021) ("This dissatisfaction necessarily sounds in medical malpractice, which, 'by itself, does not state a claim under the ADA.'"); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (holding that a Rehabilitation Act and/or an ADA claim cannot be based on medical treatment decisions); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005) (inmate's claims under RA and ADA were properly dismissed for failure to state claim as they were based on medical treatment decisions); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)

(concluding that the ADA would not be violated by a prison's failure to address the medical needs of its disabled prisoners and that the statute "does not create a remedy for medical malpractice"); *Kensu v. Rapelje*, 2015 U.S. Dist. LEXIS 120423, 1t *9-10 (E.D. Mich. Sept. 10, 2015) (ADA does not provide relief for alleged incompetent treatment); *Stevenson v. Pramstaller*, No. 07-14040, 2008 U.S. Dist. LEXIS 106448, recommendation adopted, No. 07-14040, 2009 U.S. Dist. LEXIS 25495, 2009 WL 804748 (E.D. Mich. Mar. 24, 2009) (granting defendants' motion for summary judgment on ADA claim because state prisoner alleging incompetent medical treatment is not complaining of being excluded from a prison service, program or activity, or of discrimination based on his disability).

Here Ashley's complaint is that the MDOC should have accommodated him by giving him ten (10) urostomy changes per month instead of eight (8).  (Ex. B, Ashley dep. tr., pp. 33:15-18-34:3-4.)  While Ashley argues that he could have urinated on himself due to the fact that he only had eight (8) urostomy changes per month, instead of ten (10), he admits that he never actually ran out of supplies, nor did he ever experience a leak that caused him to urinate on himself.  (Ex. B, Ashley dep. tr., p. 16:11-17.)  Further, while Ashley was prescribed eight (8) changes per month, he was given instructions on multiple occasions to let healthcare know if he ever ran out and they would get him more.  (Ex. C, Ashley medical records, p.) Ashley saw healthcare most days for emptying and cleaning his urostomy supplies and never ran out of the supplies he was prescribed.  (Ex. B, Ashley dep. tr; Ex. C, Ashley medical records, pp. 40, 55-76.)  There simply is no refusal to accommodate

here – but instead a difference in opinions about what medical treatment should have been given.  Claims brought under the Rehabilitation Act and/or ADA cannot be based on medical treatment decisions.  *Fitzgerald*, 403 F.3d at 1144. As Ashley has only alleged incompetent medical treatment, not discrimination, his ADA and RA claims fail, and as such, summary judgment in favor of the MDOC is appropriate.

## IV.    Blue is entitled to qualified immunity.

Government officials acting within the scope of their authority are entitled to qualified immunity if their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F. 3d 840, 847 (6th Cir. 2007) (internal citations omitted).  If a plaintiff fails to show a violation of a constitutional right or that the right was not clearly established at the time of the defendant's alleged violation, qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  Thus, Ashley has the burden to prove that Blue is not entitled to qualified immunity. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992) (internal citations omitted).

As explained above, Ashley cannot show that Blue violated his constitutional rights by being deliberately indifferent to a serious medical condition. Even if Ashley could show that his constitutional rights were violated, he cannot show that those rights were clearly established.  To be clearly established, "[t]he contours of

the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  To find a clearly established constitutional right, the district court "must find binding precedent by the Supreme Court, its Court of Appeals, or itself." *Fisher v. Harden*, 398 F.3d 837, 845 (6th Cir. 2005).  While prisoners do have a right to be free from cruel and unusual punishment, it is well established that differences of opinion in medical treatment do not rise to the level of an Eighth Amendment violation.  *Smith v. Sator,* 102 F. App'x 907, 909 (6th Cir. 2004).  In this case all of Ashley's disputes are over the type of, and amount of, medical treatment and supplies he had access to.  There is no clearly established right for a prisoner to dictate exactly the course of medical treatment provided to him.  As such Blue is entitled to qualified immunity.

## CONCLUSION AND RELIEF REQUESTED

Defendants, the Michigan Department of Corrections and Lori Blue, respectfully request that the Court grant summary judgment in their favor, as Ashley is unable to establish Eighth Amendment, Americans with Disabilities Act or Rehabilitation Act violations.  Alternatively, Defendant Blue requests qualified immunity because Ashley has equally failed to show Defendant violated his clearly established constitutional rights.

Respectfully submitted,

*/s/ Ryanne E. Rizzo*
Ryanne E. Rizzo (P83838)
Assistant Attorney General

Attorney for MDOC Defendants
Michigan Dept. of Attorney General
Corrections Division
P.O. Box 30217
Lansing, MI 48909
rizzor1@michigan.gov

Dated: December 20, 2024

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 20, 2024, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record and placed in U.S. Postal Service a copy of the above document to non-ECF participant:

Carl Ashley #136985
Muskegon Correctional Facility
2400 S. Sheridan Drive
Muskegon, MI  49442

*/s/ Ryanne E. Rizzo*
Ryanne E. Rizzo (P83838)
Assistant Attorney General
Attorney for Defendants the MDOC
and Blue