**FILED - GR**
February 18, 2025 12:49 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:JMW   SCANNED BY: KB 2/18

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL LEE ASHLEY,

    Plaintiff,

v

E'COE HILL, et al,

    Defendants.

Case No: 1:24-cv-00031-JMB-RSK

HON. JANE M. BECKERING

MAGISTRATE JUDGE RAY S. KENT

PLAINTIFF'S RESPONSE TO DEFENDANTS DR. RICKEY COLEMAN,
E'COE HILL, NP, AND HEATHER DOOLITTLE, NP'S
MOTION FOR SUMMARY JUDGMENT

PROOF OF SERVICE

# TABLE OF CONTENTS

INDEX TO AUTHORITIES                                              iii

STATEMENT OF FACTS                                                 1

ARGUMENT                                                           2

RELIEF REQUESTED                                                  19


PROOF OF SERVICE

EXHIBITS

AFFIDAVIT OF CARL ASHLEY

## INDEX TO AUTHORITIES

| CASE | PAGE |
|---|---|
| Ancata v Prison Health Servs, 769 F2d 700 (11th Cir 1985) | 17 |
| Ashley v Boayue, 2:19-cv-10484-MAG-DRG | 3,14,15 |
| Baker v Blanchette, 186 F Supp 2d 100 (D Conn 2001) | 3 |
| Bellamy v Bradley, 729 F2d 416 (6th Cir 1989) | 17 |
| Blackmore v Kalamazoo County, 390 F3d 890 (6th Cir 2002) | 4,7 |
| Boretti v Wiscomb, 930 F2d 1150 (6th Cir 1991) | 5, 19 |
| Brooks v Celeste, 39 F3d 125 (6th Cir 1994) | 2 |
| Champion v DiCocco, 2018 US Dist LEXIS 144711 (ED Va Aug 24, 2018) | 3 |
| Comstock v McCrary, 273 F3d 693 (6th Cir 2001) | 2,17 |
| Dansen v Asman, 875 F2d 1239 (6th Cir 1989) | 17 |
| Estelle v Gamble, 429 US 97, 97 S Ct 285, 50 L Ed 2d (1976) | 5 |
| Farmer v Brennan, 511 US 825, 114 S Ct 1970, 128 L Ed 2d 811 (1984) | 2,8 |
| Freebee v Cejas, 161 F3d 2 (4th Cir 1998) | 3 |
| Greeno v Daley, 414 F3d 645 (7th Cir 2005) | 10 |
| Grubbs v Bradley, 552 F Supp 1052 (MD Tenn 1982) | 17 |
| Harp v Hallet, 2024 U.S. Dist LEXIS 50503 (E.D. Mich Mar 21, 2024) | 5, 6 |
| Helling v McKinney, 509 US 25, 113 S Ct 2475, 125 L Ed 2d 22 (1993) | 3 |
| Hodges v Corizon, 2016 U.S.Dist LEXIS 97349 (E.D. Mich June 22, 2016) | 9 |
| Jackson v Corizon, 2012 US Dist LEXIS 61242 (ED Mich Mar 31, 2022) | 3 |
| Johnson v Cunnigin, 2022 U.S. App LEXIS 5075 (6th Cir 2022) | 6 |
| Jones v Gaetz, 2017 US Dist LEXIS 44590 (SD ILL Mar 27, 2007) | 3 |

## INDEX TO AUTHORITIES (Con't)

| CASE | PAGE |
|---|---|
| Maddox v Edelman, 851 F3d 583 (6th Cir 2017) | 18 |
| Middlebrooks v Helton, 2023 US Dist LEXIS 103347 (MD Tenn June 14, 2023) | 18 |
| Napier v Madison County, 238 F3d 739 (6th Cir 2001) | 4 |
| Phillips v Tangilag, 14 F4th 524 (6th Cir 2021) | 6 |
| Reed v Lackawanna, 2019 US Dist LEXIS 169565 (MD Penn Sept 30, 2009) | 3, 18 |
| Rhinehart v Scutt, 2014 U.S. Dist LEXIS 159229 | 8 |
| Smith v Carpenter, 316 F3d 178 (2d Cir 2003) | 2 |
| Wallace v McCauley, 2024 U.S. Dist LEXIS 122140 (E.D. Mich July 1, 2024) | 5 |
| Watson v Jansen, 2019 U.S. Dist LEXIS 162594 (E.D. Mich Sept 24, 2019) | 6 |
| Westlake v Lucas, 537 F2d 857 (6th Cir 1976) | 17 |
| Whitley v Albers, 475 US 312, 106 S Ct 1078, 89 L Ed2d 251 (1976) | 8 |
| Williams v Erickson, 962 S Supp 2d 1038 (ND Ill 2013) | 3, 18 |
| Wilson v Seiter, 501 US 294, 118 S Ct 2321, 115 L Ed 2d 271 (1991) | 2 |

## STATEMENT OF FACTS

Statement of facts as outlined in the Amended Complaint are adopted by reference.

More specific facts will be provided in the following arguments.

## ARGUMENT

### EIGHTH AMENDMENT VIOLATIONS

A prisoner bringing a claim of deliberate indifference must meet two requirements to succeed. See Farmer v Brennan, 511 US 825, 834, 114 S Ct 1970, 128 L ED 2d 811 (1994). The first requirement - the objective factor - requires that the alleged deprivation be of a sufficiently serious need. Id. To satisfy the objective component, Farmer requires only that "the inmate show that he is incarcerated under conditions posing a substantial risk of serious harm;" 511 US at 834, so as to avoid "the unnecessary and wanton infliction of pain." Id. The Sixth Circuit has defined this objective factor as evidence of "serious medical needs." Brook v Celeste, 39 F 3d 125, 128 (6th Cir 1994), and later noted the evidence need only show that the "medical need at issue is sufficiently serious." Comstock v McCrary, 273 F3d 693, 702-03 (6th Cir 2001)(quoting Farmer, 511 US at 834)(emphasis added).

The second requirement - subjective component - "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" Farmer, 511 US at 834 (quoting Wilson v Seiter, 501 US 294, 297, 111 S Ct 2321, 115 L Ed 2d 271 (1991)). This means that the defendant must have a "sufficiently culpable state of mind." Id.

As the Supreme Court has held, the test for deliberate indifference is whether there exists a "substantial risk of serious harm," Farmer, 511 US at 837, and does not require actual harm to be suffered. (See Smith v Carpenter, 316 F3d 178, 189 n 15 (2d Cir 2003)(observing that "actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation" and declining to adopt a per se rule that such injury is required)(citing in part

Helling v McKinney, 509 US 25, 35, 113 S Ct 2475, 125 L Ed 2d 22 (1993)).

## OBJECTIVE COMPONENT

Corizon Defendants in this case state "As an initial matter, Corizon Defendants do not dispute that Plaintiff's history of UTIs following a Cystoprostectomy and placement of an ileal conduit urostomy constitutes an objectively serious medical need." (ECF No. 48, PageID.602). Also, "As an initial matter, there is no dispute that Ashley had a serious medical need for ostomy care after his bladder surgery." (See Ashley v Boayue, 2:19-cv-10484-MAG-DRG, ECF No. 87, PageID.1266).

Despite these concessions by the instant Defendants, Ashley submits the following as to the objective component of his claim.

In Reed v Lackawanna, 2019 U.S. Dist LEXIS 169565 (MD Penn Sept 30, 2019), at *5, the Court held:

> "The use of a colostomy can constitute a serious medical
> need as there are obvious 'risks inherent in a colostomy,
> including but not limited to, irritation, infection, and
> herniation. Without a doubt, a colostomy requires a doctor's
> attention on occasion and significantly affects an
> individual's daily activities.'" (citing Williams v
> Erickson, 962 F Supp 2d 1038, 1042 (ND Ill 2013)

See also Jones v Gaetz, 2017 US Dist LEXIS 44590 (SD Ill Mar 27, 2017); Champion v DiCocco, 2018 U.S. Dist LEXIS 144711 (E.D. Va Aug 24, 2018) (Plaintiff's use of colostomy bag is a serious medical need); and, Freebee v Cejas, 161 F3d 2 (4th Cir 1998)(unpublished) (alleged need for colostomy bags constitutes serious medical need).

In Jackson v Corizon, 2022 US Dist LEXIS 61242 (ED Mich Mar 31, 2022), the Court stated that the "serious medical need here is demonstrated by the colostomy itself, which 'even a lay person would recognize as creating a serious need for medical attention.'" Jackson, at *16) (quoting Baker v Blanchette, 186

-3-

F Supp 2d 100, 105 (D Conn 2001) ("[V]iewing the evidence in a manner most favorable to the plaintiff, a reasonable jury could find that his colostomy constituted a serious medical condition."). "This is sufficient to satisfy the objective prong ...". Jackson, at *17.

Although the above speaks about "colostomy", a urostomy, ileostomy, and colostomy all have the same inherent risks. Without the care of a physician, there exists a "substantial risk of harm" from urinary tract infections in patients with Urostomies.

In Blackmore v Kalamazoo County, 390 F3d 890, 898 (2002), the Court declared that Napier v Madison County, 238 F 3d 739, 742 (6th Cir 2001), does not apply when there is a "serious medical need" ("In a word, Napier does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers."). Blackmore, 390 F 3d at 898.

## D-MANNOSE

Ashley had been prescribed one cup of cranberry juice daily to help combat UTI's. In Clapper's Report of December 29, 2020, he ordered D-Mannose in place of cranberry juice and stated: "Recommend D-Mannose supplement BID. Please note cranberry juice is not enough to suffice, as it would have to be consumed in quantities that are unrealistic." (ECF No. 48-2, PageID.743). Clapper effectively said the cranberry juice was ineffective. Defendants Hill and Coleman delayed the D-Mannose for nonmedical reasons.

On March 5, 2021, Ashley received a Step II Grievance Appeal Response, which stated the D-Mannose is

> "... approved. Your MP is off today and should return on Monday. Your MP will have notification of the approval and can order the medication." (See Exhibit A; Step II Grievance Appeal Response, dated 3/5/2021).

On 3/23/2021, Ashley received a Step II Grievance Appeal Response (LCF-2021-02-0165-12F), which states:

> "Mr. Ashley, this was discussed with the MP who informs this respondent, she did notify the person who places the orders as soon as the ACMO approved it on 3/1/2021 however, since we had to purchase the 'pure cranberry juice', the supply of the juice is being utilized first, prior to starting the D-Mannose tablets. The D-Mannose tab were just reported as being recieved to the warehouse. The juice is alamost gone and then Grievant will start receiving the D-Mannose tablets." (See Exhibit B; Step II Grievance Appeal Response, dated 3/23/2021).

The Supreme Court has already instructed that "intentionally interfering with a [prescribed] treatment" can establish a constitutional violation, Estelle, 429 US at 104-05, and that is exactly what Plaintiff alleges here. Although this part of Estelle may be considered dicta, the Sixth Circuit has denied summary judgment to a jail nurse for the same reasons:

> Generally, officials who perform discretionary functions have at least qualified immunity from individual damages that have resulted from the exercise of their discretionary functions .... Complying with a doctor's prescription or treatment plan is a ministerial function, not a discretionary one. For this reason, we don;t believe [Defendant's] motion for summary judgment should be granted on the basis of qualified immunity.

See Boretti v Wiscomb, 930 F 2d 1150, 1156 (6th Cir 1991).

A reasonable juror could conclude that the prescription (D-Mannose) was withheld for a nonmedical reason and return a verdict for Plaintiff on this claim. Wallace v McCauley, 2024 U.S. Dist LEXIS 122140, * 6-7 (E.D. Dist Mich July 11, 2024) (citing Harp v Hallett, No. 2:19-cv-13789, 2024 U.S. Dist LEXIS 50503, 2024 WL 1217391 (E.D. Mich Mar 21, 2024)(explaining that "if a physician has withheld prescribed treatment for nonmedical reasons ... the physician has simply interfered with a prescribed course of treatment" and "has not made a 'medical judgment'"). Because Ashley makes an allegation about an intentional

change in treatment for nonmedical reasons, "he need not provide expert medical testimony, which would not aid a factfinder in deciding his claims." (See Harp, * 7).

Not only are the facts of Ashley's case distinguishable from Phillips v Tangilag, 14 F4th 524 (6th Cir 2021), the factual dispute at the center of this case is not a disagreement about adequacy of treatment in the same sense as Phillips. Ashley's position is that Defendants "did not make [their] decision for medical purposes", but instead Hill and Coleman made their decisions for nonmedical reasons.

> "[I]f a physician has withheld prescribed treatment for nonmedical reasons, then the factfinder is no longer tasked with weighing various courses of treatment as the provider has not made a 'medical judgment'; rather, the physician has simply interfered with a prescribed course of treatment." Harp, * 7).

In the Sixth Circuit, when a plaintiff alleges an intentional change in treatment for nonmedical reasons, the case must be treated differently than one where the dispute is about the adequacy of medical care that was guided by a professional's medical judgments. See Johnson v Cunnagin, 2022 U.S. App LEXIS 5075, 2022 WL 2662001, at 2 (6th Cir Feb 24, 2022).

Hill states that she did not know the D-Mannose had not been ordered or delivered to Ashley. In Watson v Jansen, 2019 U.S Dist LEXIS 162594 (E.D. Mich Sept 24, 2019), the Court found that "Of course, a jury could find that Defendant [] perceived' - in other words, saw or became aware of - "these facts on several occasions", and the Court listed those reasons, which included performing chart reviews. (Watson, * 22; see also Richmond v Hug, 885 F3d 928, 940 ("A reasonable jury could find that [defendant] reviewed or should have reviewed [plaintiff's] chart, which would have made [her] aware of the risk that the [j]ail medical staff had and would continue to fail to adhere to his

prescribed plan of care, and that he subsequently disregarded that risk by failing to ensure that [her] orders were implemented as prescribed.").

Hill "reveiwed or should have reviewed" Ashley's chart to follow up on her order for the D-Mannose. Although Hill claims that the HUM was responsible for the decision to withhold the D-Mannose until the cranberry juice was depleted, the Step II Respondent (Aiken) clearly states that she discussed the issue with the MP [Hill], and "she" indicated that the juice had to be used first. The HUM is a male.

Defendant Hill and Coleman "withheld the prescribed treatment", their decision was not a "medical judgment", but was based on nonmedical reasons such as the cost of the cranberry juice. ("since we had to purchase the 'pure cranberry juice', the ... juice is being utilized first"); and, Coleman ("There was an initial inadvertent delay in getting it started because I thought it needed to be ordered through the pharmacy." (ECF No. 48-3, PageID.822)). Coleman also states "My response was not a denial but was intended to guide the requesting provider to resubmit the request through the non-formulary medication process" (Id, PageID.823); "It appears the responses took my ATP as a denial, but it was not a denial." Id, PageID.823)). There is nothing in the medical record where Coleman gave any advice or guidance on how to order D-Mannose. And although "ATP", according to Coleman, is not a denial, it is not an approval.

Coleman also states

> "Further, it is my opinion, within a reasonable degree of medcical certainty, that the patient was not harmed in any way from any delay in receiving the D-Mannose tabs. He had never been on it before and he was still receiving cranberry juice which another urologist had recommended while waiting for the D-Mannose to start. While he did develop UTIs, it cannot be said that he developed them because he was taking cranberry juice instead of D-Mannose." (ECF No. 48-3, PageID.824)

Defendant Clapper ordered the D-Mannose because "cranberry juice is not enough to suffice, as it would have to be consumed in quantities that are unrealistic." (ECF No. 48-2, PageID.743). Clapper effectively said the cranberry juice was ineffective to prevent UTI's. Also, while Coleman said that "it cannot be said that he developed them because he was taking cranberry juice instead of D-Mannose.", it can be said with certainty that Coleman and Hill continued Ashley on a treatment that was known to be ineffective to prevent UTIs.

"Even after a prison medical official provides treatment, "a prisoner has a claim of deliberrate indifference if the official continues the prisoner on a course of treatment known to be ineffective." Gulley v Ghosh, 864 F Supp 2d 725, 729 (N.D. Ill 2012); See also Rhinehart v Scutt, 2014 U.S. Dist LEXIS 150229, 2014 WL 5361936, At *20-21.


## SUBJECTIVE COMPONENT

The subjective component requires a showing that the "official kn[ew] of and disregard[ed] an excessive risk to inmate health and safety." Farmer, 511 US at 637. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id. "An express intent to inflict unnecessary pain is not required." Whitley v Albers, 475 US 312, 319, 106 S Ct 1078, 89 L Ed 2d 251 (1976).

## URINARY TRACT INFECTIONS

On December 29, 2020, Clapper recommended the following: "Do not run a urinalysis unless patient has a fever or Leukocytosis." And, under "PLAN": Only complete UA's if patient has fevers." (ECF No. 48-2, PageID.743). Since that date, Hill and Doolittle provided no treatment at all for diagnosed urinary tract infections.

Ashley complained of UTI symptoms on March 8, 2021, stating "I have pain in the back right above the kidneys, nausea, loss of appetite, and cloudy urine

w/strong odor. Please place me on call for evaluation of possible UTI." (Exhibit C; HCR, March 8, 2021); some complaints were made on: HCR, March 18, 2021; Exhibit D; HCR, April 4, 2021; Exhibit E; HCR, April 29, 2021; Exhibit F; HCR, June 13, 2021; Exhibit G; HCR June 25, 2021, Exhibit H; HCR, July 3, 2021, Exhibit I; HCR, July 8, 2021, Exhibit J; HCR, September 4, 2021, Exhibit K.

Ashley was diagnosed with UTI's at the following times:

Urine Dispstick results after Clapper's recommendations on December 29, 2020, were: 8/13/2021, Leukocytes +1; 06/14/2021, Leukocytes 2+; 04/06/2021, Leukocytes 3+; 03/09/2021, Leukocytes 3+. (ECF No. 48-2, PageID.720). Hill and Doolittle provided no treatments for these abnormal findings which indicated infections.

DOC Lab Reports indicated bacterial infection: 4/10/2021, 3+ Leukocyte Esterate, with presence of bacteria S. Marce. (ECF No. 48-2, PageID.726; 3/12/2021, Protein +1, Blood 1+, Leukocyte Esterate 3+, with presence of bacteria S. Marce and E. coli, (ECF No. 48-2, PageID.729); 1/4/2021, Blood +1, Leukocyte Esterate "Trace", Nitrate "Positive", presence of bacteria S. Marce and E. Coli (ECF No. 48-2, PageID.732). Hill and Doolittle provided no treatments of the diagnosed bacterial infections.

On April 6, 2021, Defendant Hill stated" "Per Urology 2021-dr. Clapper does not want pt. treated with antibiotics for a +UA unless pt. is febrile and has leukocytosis." (Exhibit L; Clinical Encounter-Administrative Note, 04/06/2021).

On April 11, 2021, Hill stated "Per Urology urinalysis and culture not to be completed unless he is febrile >100.4 orally" (Complaint, ¶ 47).

In Hodges v Corizon, 2016 U.S. Dist LEXIS 97349, * 31 (E.D. Mich June 22, 2016), the Court stated

> "The Court is well aware of the body of cases which generally holds that one physician does not act with deliberate indifference simply because her assessment of an inmate's medical needs differ from another physician's assessment. But the law is also clear that notwithstanding that general rule, there is a point at which a doctor's prescribed treatment is so inappropriate under the circumstances that it recklesly disregards the risk to an inmate's health, and therefore constitutes deliberate indoifference. See Greeno v Daley, 414 F 3d 645, 654 (7th Cir 2005) ("the defendants' contention that Greeno's claim fails because he received some treatment overlooks the possiblity that the treatment Greeno did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his comndition")

Hill stated that she "deferred to the expertise of the specialist regarding the patient's UTIs. He has been repeatedly educated on the dangers of developing antibiotic resistant bacteria in his urine. If he takes too many antibiotics, more resistance will develop and the bacterial infections will become difficult or impossible to treat. This could ultimately lead to his death." (ECF No. 48-1, PageID.830)  And Doolittle stated, "I deferred to the expertise of the specialist regarding treatment of his chronic UTIs which were resistant to many antibitoics due to colonization." (ECF No. 48-4, PageID.828). Not treating the many symptoms of UTIs and diagnosed UTIs is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriouly aggravate" ashley's kidney disease. As stated, Hill, and Doolittle, did not provide any treatment for the UTIs despite the fact that there were many antibiotics available for treatment. In their own words, Hill and Doolittle deferred to Clapper's assessment and did not exercise their own medical judgment in relation to Ashley's diagnosed UTIs.

Ashley showed Hill and Doolittle printouts from http://www.uclahealth.org/core-kidney/urinary-tract-infection. and, "Urinary Tract Infections in Patients with Urinary Diversion", American Journal of Kidney Disease, Vol 46, No 6, December 2005, p 1031, which describes the high degree of

mecial care for urinary tract infections.

In the article from uclahealth.org, it states:

> "[K]idney infection starts with symptoms of lower urinary tract infection ..."; "Most cases of kidney infection come to a complete cure. However, if left untreated, it can lead to life-threatening complications which include: Permanent kidney damage which lead to chronic kidney disease and kidney failure." (See Exhibit M).

Also presented to Hill and Doolittle was a publication "Urinary Tract Infections in Patients with Urinary Diversion". In this publication it states:

> "Because conduit urine is bacteriuric in most cases, clinicians have to decide when to provide antibiotic coverage. Treatment should be instituted if symptoms suggest upper or lower urinary tract infection. A major concern is renal impairment." ("Urinary Tract Infections in Patients with Urinary Diversion", American Journal of Kidney Disease, Vol 46, No 6, December 2005, p 1031).(See Exhibit N).

Hill and Doolittle refused to treat the diagnosed UTIs, or to check with Defendant Clapper to seek possible treatment options to protect Ashley's kidneys.

On November 19, 2020, a Computed Tomography of the Abdomen and Pelvis was performed on Ashley. In the FINDINGS, it states "Kidneys, Ureters, /T/ Bladder: Small ... areas of cortical scarring bilaterly." (See Exhibit O; Computed Tomography, by Dr. Keith L. Papendick, MD, Exam Date 11/19/2020).

On September 16, 2024, after the refusal to treat urinary tract infections by Defendant's Hill, Doolittle, Blue, and Clapper, a US RETROPERITONAL COMPLETE exam was performed on Ashley. This exam, in relation to Ashley's kidneys, found "There is mild bilateral renal cortical atrophy." (See Exhibit P; US RETROPERITONAL COMPLETE, signed and verified by Dr. Anthony Barclay, MD, on 9/17/2024). From November 19, 2020, to September 16, 2024, Ashley's kidneys went from "cortical scarring bilaterally" to Bilateral renal cortical atrophy."

According to the National Kidney Foundation,

> "Kidney Atrophy may be due to: Long-lasting kidney infections (pyelonephritis): An infection in the kidneys. Usually caused by bacteria. It starts as a bladder or urinary tract infection and moves to the kidney." (See Exhibit Q; "Kidney Atrophy", Medically reviewed by NKF Patient Education Team, last updated on April 01, 2024).

On February 10, 2021, Ashley filed a Prisoner/Parolee Grievance against Defendant Coleman for refusing to follow the orders of Defendant Clapper stating that his refusal would expose "me to unnecessary pain and suffering from these chronic UTI's". (See Exhibit R; Prisoner/Parolee Grievance #LCF-21-0-2-0165-12F).

On March 9, 2021, Ashley submitted a request for a Nephrologist consultation for his Stage III Kidney Disease. Ashley also requested the Nephrologist consultation on March 9, 2021, April 12, 2021, August 7, 2021, and October 6, 2021. (See Exhibits S, T, U, V; HCR's). Defendants Hill and Doolittle would not schedule an appointment with a Nephrologist for guidance on protecting Ashley's kidneys.


## UROSTOMY SUPPLIES

Corizon Defendants make reference to "an assessment from another medical provider" in relation to the amount of urostomy supplies Ashley should receive. This is a reference to Physician's Assistant Mary Boayue. After the emergent appointment at U of M, Ashley requested for his supplies to be increased to 3 changes per week, Boayue informed him that this

> "request [is] inappropriate due to mucosal/dermal separation that took place for which he had to be seen emergently by

urostomy nurses at U of M. Their recommendation was for there to be only 2 changes per week." (ECF No. 73-3, PageID.913)." (See Ashley v Boayue, 2:19-cv-10484-MAG-DRG, ECF No. 87, PageID.1262).

On September 28, 2021, Defendant Clapper issued a Report, stating:

"Patient currently is without enough ostomy supplies. He provided printed prescription's for which he has used previously. I made addendum's to these prescriptions for supplies to indicate that his need of having a minimum of 10 exchanges per month with 1 year's worth of refills. He is currently modifying his activities of daily living to avoid a leak which is affecting the quality of life. Patient should undoubtedly have access to a minimum of 10 complete exchange kits (product numbers on forms attached to 409)." (ECF No. 48-2, PageID.738).

Defendants Hill and Doolittle refused to comply with the treatment plan of Defendant Clapper as it relates to increasing urostomy supplies for "quality of life issues". Hill and Doolittle also refused to comply with the treatment plan/prescription of Dr. Hafez issued on March 10, 2016.

When Ashley asked for his urostomy supplies to be increased to ten per month, Defendants Hill and Doolittle cite to the above reference to the assessment from Boayue, and stated:

"This request is inappropriate due to mucosal/dermal separation that took place for which he had to be seen emergently by ostomy nurses at U of M. Their recommendation was for there to be only two changes per week." (ECF No. 48-2, PageID.696).

Their reliance on this statement from Boayue is misplaced. Boayue was limiting the amount of urostomy changes to two per week because that was what the Ostomy Nurses recommended on February, 24, 2016. Boayue was not referring to "this was due to too many changes per week, previously, which ended up in an emergent situation." (Exhibit W, Kite Response, dated 5/18/2016). Boayue was only referring to the amount of supplies (two per week), and not that there was an emergent situation and not that too many changes caused the mucosal/dermal

separation.

This "emergent situation" was explained by Magistrate Grand in <u>Ashley v Boayue</u> On February 17, 2016, "Ashley 'experienc[ed] breakdown at the site of the urostomy with inappropriate leakage through[] the wafer connecting the ostomy appliance.' (ECF No. 73-2, PageID.824), so Boayue sent an 'Urgent' evaluation request for treatment at U of M for a 'Muco-dermal sep[a]ration of the ostomy. (<u>Id</u>)., PageID.827) " (See <u>Ashley v Boayue</u>, 2:19-cv-10484-MAG-DRG, ECF No 87, PageID.1257). And on February 24, 2016, a Nurse wrote "to be only two changes per week."

At the U of M appointment of March 10, 2016, a new prescription was ordered for a "2-piece convex pouching system, stating '20 (Twenty) each' of 'Hollister barrier 14903 with pouch 18902,' and 'Refill: 11 (Eleven). (ECF No. 1, PageID.64).'" (See <u>Ashley v Boayue</u>, 2:19-cv-10484-MAG-DRG, ECF No. 87, PageID.1258). The recommendation by U of M Ostomy Nurses on Februray 24, 2016, was overridden by this new prescription from Dr. Hafez on March 10, 2016. The prescription of March 10, 2016, became the controlling prescription

Hill also makes another reference to <u>Ashley v Boayue</u>, No. 19-10484, 2021 WL 2450776, at *2 (E.D. Mich May 27, 2021). Hill states that Magistrate Grand explained:

> While denying a medical supply that had previously been ordered for an inmate can potentially support a deliberate indifference claim[], <u>see Darrah v Krisher</u>, 865 F.3d 361 (6th Cir 2017), prescribing a certain medical supply does not automatically mean it could never be appropriate for future medical personnel to reach a different conclusion about the inmate's needs." (ECF No. 48, PageID.603).

Magistrate Grand's reference was not about the amount of supplies. His reference was to "prescribing a certain medical supply", a clear reference to

Boayue not providing Convex skin barriers, and instead choosing to continue to provide Flat skin barriers. The reference had nothing to do with the amount of supplies being issued.

Hill also references "It was also revealed that while Plaintiff was complaining that he was not receiving sufficient ostomy supplies (2 sets per week), his cell was shaken down and there were 9 sets of urostomy supplies discovered. (Ashley I, 2-19-cv-10484-MAG-DRG (E.D. Mich), ECF No. 73-2, PageID.887)." (ECF No 48, PageID.603)

In April 2016, Ashley filed a Grievance (JCF-2016-04-0800-12F3), against Boayue, stating that he was not receiving 20 changes per month of convex flanges as ordered by Dr. Hafez on March 10, 2016. This grievance was denied because the U of M note in March did "not reflect the number [of supplies] to be issued." (Ashley I, 2-19-cv-10484-MAG-DRG (E.D. Mich), ECF No. 73-3, PageID.1031).

After Ashley filed the April grievance against Boayue, he received 8 sets of flat flanges and pouches on April 26, 2016. (ECF No. 1, PageID.70). On May 17th he received 5 sets of flat flanges and pouches (Id, PageID.75). On May 31, 2016, he received another 8 sets of flanges and pouches. (Id., PageID.19; Ashley I, 2-19-cv-10484-MAG-DRG (E.D. Mich), ECF No. 73-3, Page ID.1029).

On June 9th, 2016, Boayue had Ashley's cell searched due to the complaint in the April Grievancve (#12F3), and nine sets of flat flanges and pouches were located. These were the result of the amount of supplies Nurses were providing in April and May 2016. Ashley was called to Boayue's office where she confiscated all of his urostomy supplies, and gave Ashley "2 sets of urostomy supplies", and the "rest [were] retained in clinic because he "is ordered 2 set[s] per week" and "nursing staff are giving him too many supplies." (Ashley I, 2-19-cv-10484-MAG-DRG (E.D. Mich), ECF NO. 73-3, PageID.887). "On the 15th,

he received two more sets of changes and on the 24th, he received another eight sets. (ECF No. 1, PageID.95; ECF No. 73-3, PageID.891)." (See <u>Ashley</u> <u>v</u> <u>Boayue</u>, 2:19-cv-10484-MAG-DRG, ECF No. 87, PageID.1260).

A "prison official[] who ha[s] been alerted to a prisoner's serious medical needs [is] under an obligation to offer medical care to such a prisoner." <u>Comstock</u> <u>v</u> <u>McCrary</u>, 273 F3d 693, 702 (6th Cir 2001) (citing <u>Danese</u> <u>v</u> <u>Asman</u>, 875 F2d 1239, 1244 (6th Cir 1989)).; and, "... a complete failure to treat a 'substantial risk of serious harm' to a prisoner is the equivalent of recklessly disregarding that risk," and therefore constitutes deliberate indifference. (<u>Olmetti</u> <u>v</u> <u>Kent</u> <u>County</u>, 2021 U.S. Dist LEXIS 270449 (WD Mich 2021)). The Eighth Amendment imposes an obligation to provide prisoners with reasonably adequate food, clothing, shelter, sanitation, recreation, and medical care. <u>Grubbs</u> <u>v</u> <u>Bradley</u>, 552 F Supp 1052, 1119-1124 (M.D. Tenn 1982). The failure to provide such necessities is a violation of an inmate's right to be free from cruel and unusual punishment. <u>Bellamy</u> <u>v</u> <u>Bradley</u>, 729 F2d 416 (6th Cir 1984).

Where prison authorities deny reasonable requests for medical treatment, and such denial exposes the inmate "to undue suffering or the threat of tangible residual injury," deliberate indifference is manifest. <u>Westlake</u> <u>v</u> <u>Lucas</u>, 537 F2d 857, 860 (6th Cir 1976). Similarly, "where knowledge of the need for medical care [is accompanied by the] ... intentional refusal to provide that care, the deliberate indifference standard has been met." <u>Ancata</u> <u>v</u> <u>Prison</u> <u>Health</u> <u>Servs</u>, 769 F2d 700, 704 (11th Cir 1985). Where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious. "[I]t is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." <u>Blackmore</u> <u>v</u> <u>Kalamazoo</u> <u>County</u>, 390 F3d 890, 899 (2002); See also <u>Maddox</u> <u>v</u>

Edelman, 851 F3d 583, 598 (6th Cir 2017) ("Where a plaintiff can show that his need for medical care was so obvious that even a layperson should recognize it, he is not required to provide objective evidence that he needs medical care at the time he experienced symptoms .... [A] plaintiff proceeding under this theory must still show he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame.").

## ADA/RA CLAIMS

The ADA/RA arguments as outlined in Plaintiff's Response to Defendants' Blue and MDOC's Motion for Summary Judgment, pages 9-13, are adopted by reference.

The proper defendant in a suit under Title II of the ADA is the public entity or an offfcial acting in his or her official capacities. (See Middlebrooks v Helton, No. 3:23-cv-00054, 2023 U.S. Dist LEXIS 103347, 2023 WL 4002470, * 10 (M.D. Tenn June 14, 2023)). Hill, Doolittle, and Coleman are sued in both their offical and individual capacities.

Ashley's claim was for a reasonable accommodation of two extra urostomy changes per month so he could participate in normal daily activities. A Urostomy "significantly affects an individual's daily activities." (Reed v Lackawanna, 2019 U.S. Dist LEXIS 169565, * 5 (M.D. Penn Sept 30, 2019) (citing Williams v Erickson, 962 F Supp 2d 1038, 1042 (ND Ill Mar 27, 2017)).

Even with a sufficient amount of daily urostomy supplies, Ashley's daily activities are affected simply because of the Urostomy. Any reduction in those daily supplies, supplies which had been ordered by Dr. Hafez on March 10, 2016, and PA Clapper on September 28, 2021, places even further restrictions on Ashley's daily activities. To prevent leakage, which would cause exposure of the skin to the toxic nature of urine, and could cause skin irritations and UTI's

from bacteria, Ashley limited his already limited daily activities to avoid these complications.

There was no "medical judgment" involved in the decisions of MDOC, Coleman, Hill, or Doolittle regarding the urostomy supplies.

Corizon Defendants state that "medical decisions 'do not ordinarily fall within the scope of the ADA or the Rehabilitation Act.' Glover, 536 F Supp 3d at 171. A medical decision usually implies some discretion in making that discision. When Dr. Hafez issued his prescription on March 10, 2016, and PA Clapper issued his prescription on September 28, 2021, for ten urostomy changes per month, there is no discretion involved. "Complying with a doctor's prescription or treatment plan is a ministerial function, not a discretionary one." Boretti v Wiscomb, 930 F 2d 1150, 1156 (6th Cir 1991). Therefore, Hill, Doolittle, or Coleman did not make a medical decision, and the standards in the ADA and RA do apply in this case.

Ashley also sent a letter to Coleman requesting assistance with the extra two urostomy changes, "up to twenty skin barriers and urostomy pouches", and, "up to ten leg bags per month." There was no response from Coleman. (See Exhibit X; Letter to Rickey Coleman, dated March 13, 2021). Coleman did not respond to this letter.

For these reasons Ashley believes he has submitted enough evidence to establish a violation of his Eighth Amendment right to be free from cruel and unusual punishment, and has been denied a reasonable accommodation under the ADA and RA. The Defendants' motiobn for summary judgment should be denied.

I declare under penalty of perjury that the foregoing is true and correct. Executed on Februrary 12, 2025.

Respectfully submitted,

*Carl Ashley*

CARL ASHLEY #136985
Muskegon Correctional Facility
2400 S. Sheridan Drive
Muskegon, MI 49442

Carl Ashley #136985
Muskegon Correctional Facility
2400 S. Sheridan Drive
Muskegon, MI 49442



US POSTAGE ᴾᵀᴺᴱ PITNEY BOWES

ZIP 49442 $ 004.61
02 4W
0000386200 FEB 13 2025

Clerk of the Court

Federal Building
110 Michigan NW
Grand Rapids, MI 49503