UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL ASHLEY,

    Plaintiff,

v.

E'COE HILL, *et al.*,

    Defendants.

_____/

Case No. 1:24-cv-31

Hon. Jane M. Beckering

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by plaintiff Carl Ashley, a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on motions for summary judgment filed by defendants MDOC and RN Lori Blue (collectively the "MDOC defendants") (ECF No. 43) and defendants NP E'Coe Hill, NP Heather Doolittle, and Dr. Rickey Coleman (collectively the "Corizon defendants") (ECF No. 47).

    **I.**    **Plaintiff's allegations**

In his amended complaint, plaintiff alleged that defendants violated his Eighth Amendment rights with respect to treating urinary tract infections (UTIs) which arose from a urostomy and the use of an urostomy (ostomy) pouch.[1] See Amend. Compl. (ECF No. 10).

---

[1] Defendant NP Doolittle provided an overview of plaintiff's medical history:

> The patient had a history of bladder cancer followed by surgical removal of the bladder and prostate (cystoprostatectomy) and placement of an ileal conduit urostomy, which is a new passage for the urine to leave the body. In a urostomy, a small piece of the intestine called the ileum is used to create the ileal conduit. One end of the ileum is attached to the ureters and the other end is attached to a small opening in the abdomen the surgeon creates called a stoma. After the surgery, urine flows from the kidneys through the ureters and ileal conduit and out of the stoma into a urostomy pouching (bag) system over the stoma to catch and hold the urine. I am aware that this type of reconstruction can have bacteria colonization and antibiotics do not help with this colonization. For this reason, the

1

Plaintiff's claims are addressed as to each defendant. In addition, plaintiff alleged that defendants violated his rights under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, and the Rehabilitation Act (RA), 29 U.S.C §794(a). With respect to the ADA and RA, plaintiff filed an "ADA Reasonable Accommodation Request" on October 14, 2021 seeking additional skin barriers and urostomy pouches related to the urologist's instructions. *See* Amend. Compl. at PageID.108-109. Plaintiff alleged that the ADA request was denied on March 14, 2022. *Id*.

## II.    Motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present

---

    patient would only need antibiotics if he had a fever showing he had an active infection rather than colonization of bacteria.

Doolittle Decl. (ECF No. 48-4, PageID.828-829). *See also* Urostomy information (ECF No. 44-6) (emptying, changing and concealing the ostomy pouch).

significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### III.    Plaintiff's constitutional claim

#### A.    Eighth Amendment claim

It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering such a claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id*. at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. at 9. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). "[T]his care qualifies as 'cruel and unusual'

3

only if it is 'so grossly incompetent' or 'so grossly inadequate' as to 'shock the conscience' or 'be intolerable to fundamental fairness.'" *Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021). "For prisoners to prove grossly inadequate care, moreover, courts generally require them to introduce medical evidence, typically in the form of expert testimony." *Id*. In short, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an 8th Amendment violation. *Id*. at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Stated another way, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind, equivalent to criminal recklessness." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40) (internal quotation marks omitted).

    **B.**    **RN Blue**

Plaintiff alleged two claims against RN Blue. First, RN Blue "refused to treat a continuing urinary tract infection, despite [her] knowledge of serious complications if not treated". *Id*. at PageID.109-110. Second, RN Blue's "refusal to comply with orders from specialists, caused Plaintiff unnecessary pain and suffering from multiple urinary tract infections, and placed Plaintiff

4

at substantial risk of serious harm" (the Court refers to this claim as defendants' refusal to follow "the treatment plan" developed by former defendant PA Jacob Clapper of Capitol Urology). *Id*. at PageID.110.

The treatment plan appears in PA Clapper's December 29, 2020, examination and report as part of the "Assessment and Plan". *See* Medical Report (ECF No. 46-2, PageID.559-561). The treatment plan limits the treatment of bacterial infections to specific situations and to provide plaintiff with a supplement (D-mannose) to help control infections.[2] PA Clapper explained as follows:

> I do not feel that pts symptoms correlate to pathologic urinary tract infection. I feel his back pain is MSK in nature; consider physical therapy. Therefore, it appears that patient has been treated for asymptomatic bacturia [sic] far too many times and is now leading to highly resistant bacteria in his urine.
>
> -Do not run a urinalysis unless patient has a fever or leukocytosis
> -Recommend D-mannose supplement BID. Please note cranberry juice is not enough to suffice, as it would need to be consumed in quantities that are unrealistic.
>
> In regards to the patient's discomfort upon palpation of the lower abdomen, we have discussed patient's bowel movements. He denies constipation, but states stools fluctuate between hard and soft. He currently takes Metamucil. Recommended use of Miralax.
>
> I question gross hematuria as his was clear and it was described as rust color.
>
> Questions were addressed to satisfaction.
>
> PLAN:
> -Drink plenty of fluids

---

[2] Dr. Coleman explained that:

> D-mannose is a natural sugar that may be an effective UTI prevention therapy, particularly for people with recurrent UTIs. D-mannose may have potential for curing active UTIs, but more research is needed. It works by interfering with bacterial colonization in the bladder and how the bacteria stick to the bladder wall. Whether D-mannose is more effective than cranberry juice at prevention of UTIs is not clear based on current studies, and research is ongoing in this area.

Coleman Decl. at PageID.823.

>       -Add Miralax
>       -Begin use of D-Mannose
>       -Only complete UAs if patient has fevers

Medical Report at PageID.561. Several months later, on September 28, 2021, PA Clapper made an addendum to plaintiff's prescriptions for urostomy supplies "to indicate his need of having a minimum of 10 exchanges per month with 1 year's worth of refills . . . Patient should undoubtedly have access to a minimum of 10 complete exchange kits." *Id*. at PageID.564.

Plaintiff's claims against RN Blue arose from one encounter, July 9, 2021. *See* Ashley Dep. (ECF No. 44-3, PageID.349, 352). On that date, plaintiff kited to healthcare that he was angry about having pain that he associated with UTI symptoms and stated, "I am requesting that you order treatment for this ongoing painful condition." Medical Record (ECF No. 44-4, PageID.411). RN Blue saw plaintiff later that day to evaluate his condition. However, the records reflect that plaintiff refused to allow Blue to perform the evaluation. Blue set out the events as follows:

> 3. As an RN I am unable to make medical diagnoses or prescribe medication. The scope of my abilities is to take vitals (temperature, weight, height, blood pressure, etc.), ask about the patient's subjective complaints and then send any abnormal results on to a medical provider for review.
>
> 4. On July 9, 2021, inmate Carl Ashley presented to healthcare for what he believed to be urinary tract infection (UTI) symptoms. At this encounter with Ashley, I asked him if he was experiencing a fever, or chills and he denied that he was. Ashley was short with me and demanded to speak with a medical provider as he said nursing could do nothing for him. I told Ashley that there were no medical providers available at the time but reminded him he had an upcoming visit scheduled to see a medical provider. My response angered Ashley and he refused to have his vitals taken and left healthcare without my being able to evaluate him. Before he left, I told Ashley to make sure he wrote another kite to healthcare if he developed a fever or chills.

Blue Aff. (ECF No. 44-5, PageID.444).

RN Blue's affidavit is supported by the medical records which reflect an "administrative encounter" in which plaintiff refused treatment and with comments that the inmate was "Having chronic symptoms of UTI. IM has upcoming appt with MP and will address his concerns at that visit" (ECF No. 44-4, PageID.396-397). In an addendum dated July 14, 2021, RN Blue made the following administrative note:

> IM arrived to HC for scheduled appt for complaints of Chronic UTI and kidney pain, IM reports his symptoms have not changed or worsened states, "I'm not getting any better you people are not doing any thing for me" IM educated that he has a upcoming MP appt very soon to review chronic issues, IM denies fever or chills. IM states he will wait for MP visit as nursing will do nothing for him. IM educated to report to HC if developing fever or chills. IM verbalizes understanding of education given. RTU in stable condition.

PageID.394.

Plaintiff contests the substance of the medical records. At his deposition, plaintiff testified that:

> A.  Okay. When I see Nurse Blue on July 9th, she didn't take any vitals, She asked me then, "Do you want to wait – you have an upcoming appointment with your medical provider. Do you want to wait for treatment until you see them?" I told her, "No." She said, "Well, I don't know what to do for you."
>
> She's – she's basically relying on what Nurse Practitioner Hill and Nurse Practitioner Doolittle had said in regard to Defendant Clapper's report where he said, "Don't treat him unless it's under these conditions." She's relying on that and wants to kick it to the Nurse Practitioner Hill rather than treating. She never took vitals that day. A week later – or around a week or two weeks after that, I had a fever. That's documented.

Ashley Dep. (ECF No. 44-3, PageID.351). Plaintiff also testified that "I felt I had a fever" and that "[s]he never took vitals." *Id*. at PageID.352. Plaintiff restated the gist of his testimony in a later affidavit (ECF No. 56-12, PageID.913), stating that RN Blue "refused to treat the ongoing UTI in any way."

7

With respect to plaintiff's statements that he had a fever a week or two later, RN Blue presented evidence that plaintiff did not have a fever at two later appointments in July:

> 5. In review of inmate Ashley's medical records, it appears that he attended an appointment with RN Jennifer Meyer on July 12, 2021, and his temperature was normal at 97.8.
>
> 6. In review of inmate Ashley's medical records, it appears that he attended his scheduled appointment with nurse practitioner Ecoe Hill on July 19, 2021, and again had a normal temperature at 97.7.

Blue Aff. at PageID.444.

Accepting plaintiff's version of events at the July 9, 2021 encounter, the Court finds no Eighth Amendment violation. As an initial matter, a voluntary refusal of treatment precludes an Eighth Amendment claim. *See Palmer v. Wagner*, 3 Fed. App'x 329, 331 (6th Cir. 2001).

> Prison officials are not deliberately indifferent to a prisoner's serious medical needs when the prisoner refuses to accept medical treatment. *See, e.g., Richard v. Bokor*, 379 Fed. Appx. 719, 720-22 (10th Cir. 2010) (prisoner failed to state a claim for deliberate indifference where he thwarted medical personnel's efforts by disrupting the medical visits and refusing the offered treatment)[.]

*Johnson v. Allen*, No. 1:15-cv-1329, 2016 WL 860428 at *4 (W.D. Mich. March 7, 2016). Here, while the medical records and RN Blue's affidavit state that plaintiff refused to have Blue take his vitals, plaintiff does not address his actions.

Even if there was a factual dispute over whether plaintiff refused the treatment offered, RN Blue's actions did not rise to the level of a federal constitutional violation. As discussed, the treatment plan limited the options of plaintiff's health care providers due to "highly resistant bacteria in his urine." It appears that RN Blue was following that plan by asking plaintiff to wait until his appointment with the medical provider. At most, RN Blue's was negligent in the manner in which she executed the treatment plan. *See Farmer*, 511 U.S. at 835 (mere negligence

8

in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation). Accordingly, RN Blue's motion for summary judgment should be granted.[3]

### C. Dr. Coleman

Dr. Coleman did not personally treat plaintiff. Rather, the doctor was employed by Corizon as a Utilization Management Medical Director ("UMMD") for the Michigan contract until that contract ended on September 28, 2021. Coleman Decl. (ECF No. 48-3, PageID.821-822).[4] Plaintiff alleged that Dr. Coleman interfered with the treatment plan of the specialist by refusing to approve the prescribed D-Mannose (the "D-Mannose claim"). *See* Amend. Compl. at PageID.110.[5] As discussed, PA Clapper recommended D-mannose to help control UTIs. As Dr. Coleman stated,

> The patient's medical records show the following. On December 29, 2020, the patient saw urologist PA-C Clapper for recurrent UTIs that were highly resistant to many antibiotics. (Ex. A-1, Ashley MR at 1830-32). Clapper recommended D-

---

[3] The Court notes that RN Blue includes a brief qualified immunity claim, which sets forth a general proposition without addressing any particular evidence:

> In this case all of Ashley's disputes are over the type of, and amount of, medical treatment and supplies he had access to. There is no clearly established right for a prisoner to dictate exactly the course of medical treatment provided to him. As such Blue is entitled to qualified immunity.

MDOC Defendants' Brief (ECF No. 44, PageID.335). "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Accordingly, the court deems this argument waived.

[4] Dr. Coleman explained:

> As the UMMD, I reviewed consultation requests submitted by onsite providers for things such as offsite visits, diagnostic tests, and non-formulary medications. The medical records sometimes refer to an "ACMO" request. The ACMO (Assistant Chief Medical Officer) is an old term used by the MDOC. The ACMO would review durable medical equipment ("DME") requests, and a request for DME was called an ACMO request. When that role was switched from an MDOC employee to a contracted group (Corizon, Wellpath, or VitalCore), the terminology stayed. So, I also conduct reviews for any provider who is requesting DME for a patient as an ACMO request. I am currently employed by VitalCore, which is another contractor for the MDOC.

*Id*. at PageID.822.

[5] While plaintiff included a claim that "all defendants" refused to comply with the treatment plan, he does not develop any claim other than the request for D-mannose.

> mannose as a supplement and noted that cranberry juice, which the patient was currently taking, was insufficient because it would have to be consumed in unrealistic quantities. (*Id*.).

Coleman Decl. at PageID.822-823.

Dr. Coleman stated that he did not "refuse" to provide the D-mannose supplement.

*Id*. at PageID.822. Rather,

> There was an initial inadvertent delay in getting it started because I thought it needed to be ordered through the pharmacy. However, the pharmacy did not carry D-mannose and it took a little time to sort out how to acquire it for the patient.

*Id*. Dr. Coleman, relying on his personal knowledge and the medical records[6], set forth the history of this delay as follows:

> On January 4, 2021, PA Margaret Ouellette noted the urologist's recommendations, including for D-Mannose two pills daily. (*Id*. at 1496). She noted she was unable to order D-mannose in COMS (the electronic medical record) and sent her concern to the pharmacy. (*Id*.).
>
> On January 5, 2021, PA Ouellette submitted an ACMO request for D-mannose. (*Id*. at 58-60). In response, I returned an Alternative Treatment Plan ("ATP"), noting that medications must be approved through the non-formulary process. (*Id*.). My response was not a denial but was intended to guide the requesting provider to resubmit the request through the non-formulary medication process. At the time, I thought that D-mannose needed to be ordered through the pharmacy and a separate form had to be initiated for that.
>
> I understand the patient submitted kites asking about the D-mannose and the responses stated that it was denied, but I do not receive kites or respond to them. (*Id*. at 1630, 1632). It appears the responses took my ATP as a denial, but it was not a denial.
>
> On February 26, 2021, NP E'Coe Hill submitted an ACMO request for the D-mannose. (*Id*. at 73-76). Her request noted the patient's long history of UTIs and recommendation from the previous urologist to drink cranberry juice but the new urologist disagreed and recommended D-mannose instead. Hill noted that a previous request for D-mannose was ATP'd with recommendation to request through the non-formulary process. However, the pharmacy stated, "It's not a drug. D-mannose is a natural sugar available in health food stores and online." So, resubmitting it for approval so this can be ordered and cranberry juice cancelled.

---

[6] Corizon defendants Dr. Rickey Coleman, NP Hill, and NP Doolittle cite the Bates Numbers to plaintiff's pertinent medical records, which appear in ECF No. 48-1, PageID.632-818.

10

>   [sic] On March 1, 2021, I approved the request. (*Id*.). This was the end of my involvement with the patient regarding D-mannose approval, although I approved numerous other requests for him related to his ostomy supplies and other things.
>
>   Any delay in the patient receiving the D-mannose was due to inadvertence and not deliberate indifference. Further, it is my opinion, within a reasonable degree of medical certainty, that the patient was not harmed in any way from any delay in receiving the D-mannose tabs. He had never been on it before and he was still receiving cranberry juice which another urologist had recommended while waiting for the D-mannose to start. While he did develop UTIs, it cannot be said that he developed them because he was taking cranberry juice instead of D-mannose. In fact, I reviewed the medical records and the patient later developed UTIs even while taking D-mannose instead of cranberry juice. (*Id*. at 1399-1400, 1576, 1658).

*Id*. at PageID.823-824 (paragraph numbering omitted).

In summary, there is no evidence that Dr. Coleman denied plaintiff the D-mannose supplement, which he approved on March 1, 2021. While plaintiff was delayed the supplement for about two months, he had access to another supplement (cranberry juice) which was recommended by a previous urologist. At most, the record reflects that the health care department was negligent in handling the recommendation for D-mannose." Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Farmer*, 511 U.S. at 835. Accordingly, Dr. Coleman's motion for summary judgment should be granted.

### D.     NP Hill

NP Hill provided medical treatment to plaintiff at various times from September 13, 2020 to September 28, 2021. Hill Decl. (ECF No. 48-1, PageID.616, 630). Plaintiff alleged four claims against NP Hill. First, NP Hill "interfered with the treatment plan of the specialist by continuing Plaintiff on cranberry juice, known to be ineffective, causing unnecessary pain and suffering, due to costs". Amend. Compl. at PageID.109. Next, NP Hill "refused to provide sufficient urostomy supplies to meet the monthly needs of Plaintiff, which restricted his daily

11

activities and participation in public programs". *Id*. Finally, alleged that NP Hill refused to treat the UTI and refused to follow the treatment plan. *Id*. at PageID.109-110.

### 1. NP Hill dispensed cranberry juice, refused to treat plaintiff's continuing UTI, and refused to follow the treatment plan

Plaintiff contends that NP Hill refused to follow the treatment plan because she continued to provide him with cranberry juice and refused to treat his UTIs. These claims appear to arise from NP Hill's review of lab findings and plaintiff's July 19, 2021 interaction with Hill. NP Hill summarized her actions with respect to these matters (citing plaintiff's medical record):

> On March 9, 2021, the patient saw RN Raeann McIntosh in the clinic after he kited for possible UTI. (*Id*. at 1466-67). A urine dipstick was completed and abnormal findings were reported to the provider. Per the provider and Urology consult, the patient had been on so many antibiotics that his urine has developed a highly resistant bacteria. McIntosh noted she would send urine for a urinalysis and culture if indicated. (*Id*.). The urine dipstick was positive for nitrite, 2+ blood, and 3+ leukocytes. (*Id*. at 1658). He also had a urinalysis and urine culture. (*Id*. at 1700-01). The culture grew S. marcescens and E. coli, which was resistant due to acquired extended spectrum beta-lactamase. In addition, there were multiple organisms consistent with urethral flora. (*Id*.).
>
> On March 15, 2021, I noted the patient's abnormal lab findings, but that the urologist recommended no urinalysis with cultures to be obtained unless the patient was febrile. (*Id*. at1458). I did not order antibiotics because there was no elevated temperature noted. (*Id*.).

PageID.623-624.

> On July 19, 2021, I saw the patient for a chronic care and annual visit. (*Id*. at 1372-77). I noted he had been treated for recurrent UTIs associated with bilateral flank tenderness but he did not have fever or leukocytosis and Urology recommended unless he had those to NOT test his urine. The patient also had Stage 3A renal disease and was convinced it was related to his UTI history, but I educated him that it was more related to his hypertension and long history of NSAID use. The patient disagreed and was argumentative on nearly every item of discussion. He believed that I did not give him D-mannose tabs, and I advised him that I requested ACMO approval and received it and then requested them to be ordered. I had no knowledge he did not receive them until he kited. I further advised him that the Housing Unit Manager (HUM) requested to utilize the remaining ACMO-approved cranberry juice prior to the D-mannose tabs being issued. I had nothing to do with the decision, but it seemed reasonable as the juice was expensive. I

> explained to him that, in any event, neither the juice nor the D-mannose tabs showed evidence-based improvement on reducing UTIs. The patient reported compliance with medications but wanted more supplies and was frustrated with MDOC/NSAC guidelines. I prescribed doxycycline for ten days for current testicular swelling, ordered labs, and provided education. (*Id*.). I also submitted consultation requests for a scrotal ultrasound and a Urology follow-up visit, which Dr. Keith Papendick approved. (*Id*. at 109-16). My understanding is that the science is not yet clear on the benefits of cranberry juice or D-mannose in prevention and treatment of UTIs.

Hill Decl., PageID.626-627.

The medical records reflect that NP Hill followed the treatment plan with respect to plaintiff's UTIs. Plaintiff has failed to provide any medical expert testimony to the contrary. The remaining issue involves NP Hill's use of the cranberry juice until the D-mannose pills were issued. Medical Records PageID.655. As discussed, a previous urologist had recommended the cranberry juice, NP Hill had ordered the D-mannose, and the D-mannose was approved on March 1, 2021. *Id*. at PageID.655-658. Nothing in this record indicates that NP Hill acted with deliberate indifference with respect to providing plaintiff with supplements of either cranberry juice or with D-mannose. Accordingly, NP Hill should be granted summary judgment on these claims.

### 2. NP Hill refused to provide sufficient urostomy supplies

With respect to plaintiff's urostomy supplies, NP Hill stated:

> On May 10, 2021, the patient initiated a kite requesting additional urostomy supplies. (*Id*. at 1585). He wrote that he changes his urostomy appliance every third day and was currently receiving 2 per week (8 per month) but it was not enough. He wrote that the Nurse Advisory Committee Guidelines state, "Change your pouch every 4-5 days (change it immediately if a leak occurs). He requested authorization for two additional urostomy changes per month because his change schedule was every third day and if a leak occurred, he would have no extra changes to accommodate that leak. He wrote that ACMO approval has been given for ten changes per month and he needed two additional urostomy changes to match the approval from ACMO. (*Id*.).

PageID.625.

> On May 11, 2021, the patient submitted another kite requesting an increase in ostomy supplies. (*Id*. at 1583). I performed a chart review in response to the requests. (*Id*. at 1412-13). I noted an 8/15/16 note from a provider at his previous facility: "He also asked for his urostomy supplies to be increased to 3 changes per week. This request is inappropriate due to mucosal/dermal separation that took place for which he had to be seen emergently by urostomy nurses at U of M. Their recommendation was for there to be only 2 changes per week. These instructions were reiterated to him." Based on this information, I concluded the patient did not need the extra two that the ACMO approved. However, should he develop a leak he could contact healthcare for the additional to be issued. The two extra pillows had no clinical/medical indication although one extra pillow and case was given. I reviewed his chart back to August 2016 and saw no indication at that time for two pillows either. (*Id*.). On May 18, 2021, the patient submitted a kite asking for the result from the chart review. (*Id* at 1582). The response reiterated that the recommendations from U of M were for only two changes per week, as too many changes in the week previously ended up in an emergent situation. (*Id*.).

PageID.625-626.

NP Hill's decision regarding the urostomy supplies was based on her medical judgment, which included consideration of plaintiff's medical history and previous advice from urostomy nurses. In this regard, NP Hill pointed out that plaintiff could contact healthcare if a leak developed. Finally, while the treatment plan addendum of September 28, 2021, referred to supplying plaintiff with 10 bags per month, NP Hill's actions occurred prior to the addendum. For these reasons, NP Hill's motion for summary judgment should be granted on this claim.

E.   **NP Doolittle**

NP Doolittle provided medical treatment to plaintiff at various times from June 15, 2021 through April 2022. Doolittle Decl. (ECF No. 48-4, PageID.827). Similar to NP Hill, plaintiff alleged that NP Doolittle refused to treat his UTI, refused to provide urostomy supplies, and refused to follow the treatment plan. Amend. Compl. at PageID.109-110.

NP Doolittle summarized plaintiff's claims as follows:

> I understand the patient alleges that I refused to treat his urinary tract infection ("UTI") and refused to provide sufficient ostomy supplies. Specifically, I understand the patient alleges that on September 2, 2021, I refused to provide any

14

> treatment for his UTI because NP Hill told me not to treat his UTI unless he had a fever of 100.4. I also understand he alleges that on October 15, 2021, I refused to follow the recommendations of urologist PA-C Jacob Clapper for ten urostomy changes per month and stated that, per NP Hill, if a leak occurred, he could have the unit officer call health care and receive an extra skin barrier and pouch.

Doolittle Decl. (ECF No. 48-4, PageID.828).

> On September 2, 2021, I saw the patient for lower back pain and urinary issues. (*Id*. at 1348-49). The patient complained of low back pain with numbness/tingling to both feet. I ordered a lumbar spine x-ray but explained he may need an EMG of the lower extremities. I advised him against using NSAIDs due to kidney function, and he voiced understanding. He was concerned that he had a kidney infection and reported nausea, loss of appetite, kidney pain, fatigue, and urine odor. I noted that he had a urine dipstick done on August 13, 2021 and a nurse found the findings were normal for the patient. I also noted that he had last seen Urology on December 29, 2020 when it was stated that he had been treated for asymptomatic bacteria far too many times which had led to highly resistant bacteria in his urine. The urologist advised not to run a urinalysis unless the patient had a fever or leukocytosis. The patient denied any systemic symptoms and his temperature was 97, so he did not have a fever. (*Id*.). I did not order a urinalysis at that time because the urologist's recommendation specifically advised against it in such a scenario.

Doolittle Decl. at PageID.830.

> On September 10, 2021, I performed a chart review and updated the patient by telephone. (*Id*. at 1345). I explained the lumbar spine x-ray findings and the patient agreed to a physical therapy consultation. He also asked to have his details updated to allow three urostomy bags per week. I advised him that he was approved for two per week to keep on person (KOP), but he could come to medical at any time if he had a leak or needed it changed. He asked if I had contacted Urology about his most recent urinalysis indicating infection and I advised him that, per Urology notes, he had been treated for asymptomatic bacteria far too many times which had led to highly resistant bacteria in his urine and therefore he was not to be treated for a UTI or have a urinalysis unless he was having symptoms. (*Id*.).

Doolittle Decl. at PageID.830-831.

> On September 30, 2021, I entered an administrative note summarizing the recent Urology findings. (*Id*. at 1331-32). I noted that the patient told the urologist he was not receiving enough ostomy bags, but he received weekly ostomy bags and supplies and could come to medical at any time for bag replacement as needed if his supply was not sufficient. (*Id*.).

Doolittle Decl. at PageID.832.

NP Doolittle further stated, "I am not aware of the patient ever running out of ostomy bags. He always had access to additional supplies in medical if he needed them." *Id*. In this regard, NP Doolittle was aware of plaintiff's past problems with urostomy supplies which gave rise to the emergency situation and resulted in the limitation of two changes per week:

> On May 11, 2021, the patient submitted a kite requesting an increase in ostomy supplies. (Id. at 1583). NP Hill performed a chart review in response to the kite. (*Id*. at 1412-13). Hill cited an August 15, 2016 note from a provider at the patient's previous facility: "He also asked for his urostomy supplies to be increased to 3 changes per week. This request is inappropriate due to mucosal/dermal separation that took place for which he had to be seen emergently by urostomy nurses at U of M. Their recommendation was for there to be only 2 changes per week. These instructions were reiterated to him." Hill noted the patient did not need the extra two that the ACMO approved. However, should he develop a leak he could contact healthcare for the additional to be issued. . .

*Id*. at PageID.829-830.

The medical records reflect that NP Doolittle followed the treatment plan with respect to plaintiff's UTIs. Plaintiff has failed to provide any medical expert testimony to the contrary. With respect to the urostomy supplies, NP Doolittle was faced with two recommendations from specialists outside of the MDOC (*i.e.*, two changes per week vs. 10 changes per month). In addition, NP Doolittle recognized that plaintiff could contact healthcare if a leak developed and he needed additional supplies. Under these circumstances, the Court should not second guess NP Doolittle's medical judgments and constitutionalize a claim that may sound in state tort law. *See Graham ex rel. Estate of Graham*, 358 F.3d 377 at 385. Accordingly, NP Doolittle should be granted summary judgment on plaintiff's claims.

### IV. ADA and RA claims

Plaintiff clarified that his ADA and RA claims are "for a reasonable accommodation of two extra urostomy changes per month so he could participate in normal daily activities." *See* Plaintiff's Response (ECF No. 64, PageID.1020). Because the ADA and the RA

set forth the same remedies, procedures, and rights, the Court can address claims brought under both statutes together.[7]

> The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

> > To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability.

*Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (footnote omitted). To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show these three elements and an additional element, (4) "that the program receives federal financial assistance." *See Gohl v. Livonia Public Schools School District*, 836 F.3d 672, 682 (6th Cir. 2016).

### B.  Individual defendants

Plaintiff may not maintain an action under the ADA or the RA against the defendants in their individual capacities "because neither the ADA nor the RA impose liability upon individuals." *Lee v. Michigan Parole Board*, 104 Fed. Appx. 490, 493 (6th Cir. 2004). In this regard, plaintiff admits that "Ashley does not have a claim against Defendant Blue for ADA or RA violations." Plaintiff's Response (ECF No. 56, PageID.872).

With respect to the Corizon defendants, plaintiff states that "[t]he proper defendants in a suit under Title II of the ADA is the public entity or an official acting in his or her *official*

---

[7] *See Thompson v. Williamson County*, 219 F.3d 555, 557, n. 3 (6th Cir. 2000); *Doe v. Woodford County Board of Education*, 213 F.3d 921, 925 (6th Cir. 2000) ("Federal courts, including the Sixth Circuit, have held that because the purpose, scope, and governing standards of the acts are largely the same, cases construing one statute are instructive in construing the other. As a result we will discuss plaintiff's Rehabilitation Act claim and plaintiff's ADA claim together.") (quotation marks and internal citations omitted).

capacity." Plaintiff's Response (ECF No. 64, PageID.1020) (emphasis added). That being said, any official capacity claims against the Corizon defendants are claims against their former employer, Corizon. *See Glover v. Rivas*, 536 F. Supp. 3d 161, 170 (E.D. Mich. 2021) ("Because Wright [an employee of Corizon] is being sued in her official capacity, this claim against Wright is instead a claim against her employer, Corizon Health."). Finally, because Corizon is acting under color of state law, a suit against Wright in her official capacity is instead a suit against the state, acting through Corizon. *Id*. at 170-71 (citing *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989)) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office"). Accordingly, the individual defendants should be granted summary judgment on plaintiff's ADA and RA claims.

### C.     MDOC

A "disability" under the ADA is defined as a physical or mental impairment that substantially limits one or more major life activities. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019). "The ADA defines a disability as: "a physical or mental impairment that substantially limits one or more major life activities. . . a record of such an impairment . . . or being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). *Id*. Under the statute, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

At his deposition, Ashley testified that his disability is "disfigurement" from having his bladder removed:

Q.     What disability are you claiming?

A.     Urostomy, removal of my bladder.

> Q. And tell me how that causes you to be disabled?
>
> A. Federal law says I'm disabled because of bodily disfigurement.

Ashley Dep. (ECF No. 44-3, PageID.352). Plaintiff stated that he is not able to participate in the "program" of "[e]xercise in the yard, walking." *Id*. at PageID.353. Then, plaintiff connected "walking" as part of his treatment, stating: that he was informed that he had Stage 3 kidney disease on February 26, 2021; and, that according to specialists in articles, part of the treatment is to exercise at least five days a week for 30 minutes a day with proper diet to try to keep the kidney disease from getting worse. *Id*. Plaintiff concluded that, "Not having sufficient urostomy – urostomy supplies, like I mentioned earlier with 8 instead of 10, that limited my activities for exercise so I can maintain my health with the kidney disease." *Id*.

For purposes of this report, the Court will assume that plaintiff has a disability under the ADA. *See, e.g., Hodge v. Henry County Medical Center*, 341 F. Supp. 2d 968, 974 (W.D. Tenn. 2003) (finding enough evidence to create a jury question as to whether plaintiff was disabled where she had part of her intestinal tract removed and had a colostomy apparatus). That being said, the ADA does not create a remedy for plaintiff, because his claim is essentially a disagreement with his healthcare providers over medical supplies. *See Allen v. MDOC*, No. 1:24-cv-736, 2024 WL 3548536 at *3 (W.D. Mich. July 26, 2024) ("[t]he ADA is not violated by 'a prison's simply failing to attend to the medical needs of its disabled prisoners.'") (quoting *Nottingham v. Richardson*, 499 Fed. Appx. 368, 377 (5th Cir. 2012)); *Stevenson v. Pramstaller*, No. 2:08-cv-79, 2009 WL 1883878 at *3 (W.D. Mich. June 30, 2009) (observing that the ADA and RA "involve discrimination for an alleged disability and not medical treatment for that disability."). In short, "[t]he ADA does not create a remedy for medical malpractice." *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). *See Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (concluding that

19

an ADA lawsuit "cannot be based on medical treatment decisions"). Accordingly, the MDOC should be granted summary judgment on plaintiff's ADA and RA claims.

### IV. Recommendation

For these reasons, I respectfully recommend that the MDOC defendants' motion for summary judgment (ECF No. 43) be **GRANTED**, that the Corizon defendants' motion for summary judgment (ECF No. 47) be **GRANTED**, and that this case be **terminated**.

Dated: August 11, 2025                         /s/ Ray Kent
                                               RAY KENT
                                               United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).