FILED- LN

September 2, 2025 11:43 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: eod  scanned by:   eod 09/02

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL LEE ASHLEY,

    Plaintiff,            Case No: 1:24-cv-00031-JMB-RSK

v                         HON. JANE M. BECKERING

E'COE HILL, et al,        MAGISTRATE JUDGE RAY S. KENT

    Defendants.

## PLAINTIFF'S OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION (ECF NO. 70)

Plaintiff, Carl Lee Ashley (Ashley), objects to the Magistrate's Report and Recommendation, for the following reasons:

## OBJECTION # 1:

### BLUE

The facts of this case establish that there is a material disagreement between Ashley and Defendant Blue. The question is whether Ashley refused treatment, or Blue refused to provide a proper evaluation of complaints of continuing UTIs, by not taking Ashley's vitals on July 9, 2021, and whether her actions created a substantial risk of harm.

The Magistrate states:

> "Plaintiff kited to health care that he was angry about having pain that he associated with UTI symptoms and stated, 'I am reqesting that you order treatment for this ongoing painful condition.' Medical Record (ECF No. 44-4, PAgeID.411). (ECF No. 70, PageID.1102.

Ashley never kited Health Care expressing anger. This Health Care Request was addressed specifically to Defendant Hill. Hence, Ashley's language of "I am requesting that you order treatment ...", was a medical request to Hill for treatment. (ECF No. 56, Ex A). Blue, being a Nurse, cannot order treatment. She can only take vitals, evaluate and note symptoms, and make an appointment/recommend to the Medical Provider for possible treatment of the medical condition. Blue refused to do the vitals because, according to her, Ashley was already scheduled for the medical provider on an unrelated medical issue.

The Magistrate quoted Blue's notes from the July 9, 2021, appointment:

> "At this encounter with Ashley, I asked if he was experiencing a fever, or chills and he denied that he was. Ashley was short with me and demanded to speak with a medical provider as he said nursing could do nothing for him." and "My response angered Ashley and he refused to have his vitals taken and left healthcare without my being able to evaluate him." (ECF No. 70, PageID.1102).

On July 11, 2021, Ashley filed a Prisoner/Parolee Grievance against Defendant Blue for her failure to properly evaluate Ashley for a possible Medical Provider appointment regarding his complaints about recurring UTI's. (ECF No: 56, Ex B). After this grievance was filed, Defendant Blue then changed her notes and created an addendum on July 14, 2021, stating:

> "IM arrived to HC for scheduled appt for complaints of Chronic UTI and kidney pain. IM reports his symptoms have not changed or worsened states, "I'm not getting any better you people are not doing any thing for me." IM educated that he has an upcoming MP appt very

soon to review chronic issues. IM denies fever
or chills. IM **states he will wait for MP visit
as nursing will do nothing for him**. IM
educated to report to HC if developing fever
or chills." PageID.394." (Emphasis added) (ECF
No. 70, PageID.1103).

Ashley memorialized the July 9, 2021, encounter with Blue on
July 11, 2021, and no where did Ashley ever say he would wait for
the MP appointment instead of having his vitals taken by Blue.
Without taking vitals on July 9, 2021, there would be no record of
symptoms or vitals for the provider to assess whether Ashley
needed treatment at that time.

The Magistrate states: "Here, the medical records and RN Blue's
affidavit state that Plaintiff refused to have Blue take his
vitals, plaintiff does not address his actions." (ECF No. 70,
PageID.1104).

According to Blue's addendum, Ashley's symptoms of UTI (pain in
kidneys, nausea, fatigue, lack of appetite) "have not changed".
Ashley does explain his actions beginning on page 5 of Plaintiff's
Response to Blue. (ECF No. 56, page 5). Blue was under the
impression that Ashley had an upcoming appointment with a medical
provider, and that instead of doing vitals at that time, she could
defer performing her duties and have Ashley wait for the upcoming
appointment. "[I]t is sufficient to show that [Ashley] actually
experienced the need for medical treatment, and that the need was
not addressed within a reasonable time frame." _Blackmore v
Kalamazoo County_, 390 F3d 890, 900 (6th Cir 2004). Blue's desire
to have Ashley wait for an upcoming appointment was for a non-
medical reason. She simply did not want to perform the work. To

-3-

demonstrate the risks that are possible without proper evaluation and treatment of UTI's, Ashley attached medical articles to his Response to Blue's Motion for Summary Judgment. (ECF NO. 56, Ex D, "Urinary Tract Infections in Patients with Urinary Diversion"); and (ECF No. 56, Ex G, "Kidney Atrophy"). These articles do not appear to have been considered by the Magistrate. These Articles and publications are permitted to be considered by the Court. The Supreme Court cited to national health organizations in deciding constitutional claims. See e.g. Ferguson v City of Charleston, 532 US 67, 78-79, 121 S Ct 1281, 149 L Ed 2d 205 (2001) (citing American Medical Association materials on effects of urine testing of pregnant women who were arrested for drug use); Nelson, 583 F 3d at 350 (citing website of the American Medical Association and other articles). The articles Ashley submitted should have been considered by the Magistrate on the dangers of not properly treating urinary tract infections.


**OBJECTION # 2:**

### COLEMAN

In relation to Defendant Coleman, the Magistrate stated:

> "Dr. Coleman stated that he did not "refuse" to provide the D-Mannose supplement." And, defendat Coleman stated "I understand the patient submitted kites asking about the D-Mannose and the responses stated it was denied, but I do not receive kites or respond to them. (Id. at 1630, 1632). It appears the responses took my ATP as a denial, but it was not a denial." (ECF No. 70, PageID.1106). "On March 1, 2021, I approved the request. (Id.). This was the end of my involvement with the patient regarding the D-Mannose."

> "In summary, there is no evidence that Dr. Coleman denied plaintiff the D-Mannose supplement, which he approved on March 1, 2021. While plaintiff was delayed the supplement for about two months, he had access to another supplement (cranberry juice) which was recommended by a previous urologist." (ECF No. 70, PageID.1107).

Although Defendant Coleman may not receive or respond to kites, he does do chart reviews to determine whether a procedure or requested medication should be approved or denied. It can be inferred that when Defendant Coleman did a chart review for the approval of the D-mannose, he would have seen that his ATP was understood to be a denial, and yet, he did nothing to correct the misunderstanding of his response until he did an affidavit for this action.

The Magistrate's statement that Ashley "had access to another supplement (cranberry juice) which was recommended by a previous urologist", misses the point. PA Clapper "Recommend[ed] D-Mannose supplement BID. Please note cranberry juice is not enough to suffice, as it would need to be consumed in quantities that are unrealistic." (ECF No. 48-1, PageID.743). Clapper obviously deemed the cranberry juice as insufficient for treatment, and the D-Mannose to be the more appropriate treatment.

Clapper's recommendation being the most recent order for this treatment, would logically be the controlling treatment, regardless of whether Ashley had access to another ineffective supplement.

This Circuit has previously held that "[w]hen prison officials are aware of a prisoners obvious and serious need for medical

treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity." <u>Blackmore</u> <u>v</u> <u>Kalamazoo</u> <u>Cnty</u>, 390 F3d at 899. This holding is consistent with sister Circuits. See <u>Monmouth</u> <u>Cty</u> <u>Corr</u> <u>Institutional</u> <u>Inmates</u> <u>v</u> <u>Lanzaro</u>, 834 F2d 326, 346 (3d Cir 1987) ("[I]f necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (citations omitted)); <u>Ancata</u> <u>v</u> <u>Prison</u> <u>Health</u> <u>Servs,</u> <u>Inc</u>, 769 F2d 700, 704 (11th Cir 1985) (same).

treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity." Blackmore v Kalamazoo Cnty, 390 F3d at 895. This holding is consistent with sister Circuits. See Monmouth Cty Corr Institutional Inmates v Lanzaro, 834 F2d 326, 346 (3d Cir 1987) ("[I]f necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (citations omitted)); Ancata v Prison Health Servs, Inc, 769 F2d 700, 704 (11th Cir 1985) (same).

**OBJECTION # 3:**

### HILL

During the delay in providing the D-Mannose, although Hill knew the amount of cranberry juice being given was considered insufficient, she did not increase the amount of cranberry juice given. In addition, the Step II Grievance Respondent spoke to Hill regarding the failure to provide the D-Mannose:

> "Mr. Ashley, this was discussed with the MP [Hill] who informs this respondent, she did notify the person who places the orders as soon as the ACMO approved it on 3/1/21 however, since we had to purchase the 'pure cranberry juice', the supply of juice is being utilized first, prior to starting the D-Mannose tablets." (ECF 56, Ex B).

In the grievance response, Hill did not mention to the Step II Respondent that the HUM made the decision of utilizing the cranberry juice first before following Clapper's recommendation for D-Mannose.

Hill also stated to the Step II Respondent "One Urologist states cranberry juice and another states No cranberry juice and the D-Mannose tablets." (ECF No. 64, Ex B). This is not a medical judgment made by Hill, it is a deliberate interference with the treatment plan of Clapper. The decision by Hill to withhold the D-Mannose until the cranberry juice is consumed was made because of costs ("since we had to purchase the pure cranberry juice"), was a non-medical reason for withholding the D-Mannose.

In <u>Boretti</u> <u>v</u> <u>Wiscomb</u>, the Court reiterated that the "interruption of a prescribed plan of treatment could constitute a

-7-

consstitutional violation." 930 F2d 1150, 1154 (6th Cir 1991) (citing Estelle, 429 US at 105).

As argued previously, "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity." Blackmore v Kalamazoo Cnty, 390 F3d at 899.

Even after a prison medical official has provided treatment, a prisoner has a claim for deliberate indifference if the official continues the prisoner on a course of treatment known to be ineffective. Arnett v Webster, 658 F3d 742, 752 (7th Cir 2011); Kelly v McGinnis, 899 F2d 612, 617 (7th Cir 2008); Berry v Peterman, 604 F3d 435, 439 (7th Cir 2010); Greeno v Daley, 414 F3d 645, 654 (7th Cir 2005). A prison medical official is also deliberately indifferent if the official pursues a course of treatment based on cost rather than sound medical judgment. Johnson v Doughty, 433 F3d 1001, 1013 (7th Cir 2006); Weeks v Hodges, 871 F Supp 2d 811, 821 (N.D. Ind 2012) ("Evidence that a prison doctor has ignored an outside specialists instructions for a prison inmate is sufficient to survive a motion for summary judgment on a deliberate indifference claim.").

A reasonable juror could conlcude that the prescription for D-Mannose was withheld for a non-medical reason and return a verdict for Ashley on this claim. See Harp v Hallett, 2024 U.S. Dist LEXIS 50503 (E.D. Mich, March 21, 2024) (explaining that "if a physician has withheld prescribed treatment for non-medical reasons ... the

physician has simply interfered with a prescribed course of treatment" and "has not made a 'medical judgment'").

In this case, Clapper recommended not treating Ashley's complaints of UTI's unless Ashley had a fever or leukocytosis. As explained fully in his complaint and his Response to Defendants' motions for summary judgment, Ashley tested positive for Leukocytes many times, but there was no treatment provided by Hill or Doolittle. Hill and Doolittle both were narrowly focused on not treating Ashley's complaints of UTI unless he had a fever greater than 100.4. (Doolittle "Do not run urinalysis unless patient has a fever and/or leukocytosis" (ECF No. 48-2, PageID.680); (Hill "Per Urology urinalysis and culture not to be completed unless he is febrile >100.4 orally." (ECF No. 48-2, PageID.699)). Because of this strict focus on no treatment unless a fever, Ashley was not treated for UTI's multiple times during the relevant time periods.

Hill and Doolittle's statements regarding the treatment of Ashley's UTI's consisted of statements such as "Per Urology ...", and were not their personal medical judgments on how to treat Ashley's complaints of UTI's. By simply deferring to, and relying on, the recommendation of a previous provider (Clapper), Hill and Doolittle did not perform a personal medical assessment of the complaints. Therefore, there was no medical judgment exercised by Hill or Doolittle regarding the treatment of Ashley's UTI's.

The Magistrate also quoted Hill's declaration:

> "On May 11, 2021, the patient submitted another kite requesting an increase in urostomy supplies. (Id. at 1583). I performed a chart review in response to the request.

(<u>Id</u>. at 1412-13). I noted an 8/15/16 note from a provider at his previous facility: '<u>He also asked for his urostomy supplies to be increased to 3 changes per week</u>. <u>This request is inappropriate due to mucosal/dermal separation that took place where he had been seen emergently by urostomy nurses at U of M</u>. <u>Their recommendation was for there to be only two changes per week</u>. <u>These instructions were reiterated to him</u>." Based on this information, I concluded the patient did not need the extra that the ACMO approved ...." "I reviewed his chart back to August 2016 ...". PageID.625-626. (Emphasis added) (ECF No. 70, PageID.1110).

For the same reasons as discusseed above, Hill and Doollittle did not make a medical judgment about supplying Ashley with a sufficient amount of urostomy changes. The above emphasized statements made by a previous provider (PA Mary Boayue) who made the entry into Ashley's Electronic Medial Record on 8/15/2016, and the emphasized section is what Boayue stated about receiving additional urostomy supplies. After the U of M appointment on 2/24/2016, in which the statement "two changes per week", was made by the Ostomy Nurses at U of M, Ashley was seen and evaluated by Dr. Hafez, two weeks later, on March 10, 2016. Dr. Hafez issued a new prescription for urostomy supplies ... 20 changes per month. (See Verified Complaint, ¶ 21). Hill and Doollittle simply made a reference to Boayue's entry, without doing their own assessment, and this is not a medical judgment.

Magistrate stated: "Finally, while the treatment plan addendum of September 28, 2021, referred to supplying plaintiff with 10 bags per month, NP Hill's actions occurred prior to the addendum." (ECF No. 70, PageID.1110). The Magistrate misses the gist of

-10-

Ashley's claim against Hill.

Hill's actions prior to September 28, 2021, is the meat of the complaint about her not following the treatment plan for urostomy supplies ordered by a previous outside specialist (Dr. Hafez) and MDOC provider (Dr. Asche).

In Ashley's Verified Complaint, he lists the prescriptions that were issued for his ostomy supplies; (1) Prescription issued by U of M Ostomy Nurses on 2/24/2016 (2 changes per week) (Complaint, ¶ 20); (2) Dr. Hafez's Prescription issued on 3/10/2016 (20 changes per month) (Complaint, ¶ 21); (3) Dr. Asche's Prescription on 4/16/2020 (up to 20 changes per month) (Complaint, ¶ 22); and, (4) Clapper's prescription issued on 9/28/2021) (a minimum of ten changes per month for "quality of life issues") (Complaint, ¶ 71).

The above are the prescriptions from outside specialists (Dr. Hafez and PA Clapper) and MDOC medical provider (Dr. Asche) that Hill and Doolittle refused to follow.

Hill's request to the ACMO on 11/11/2020 requested "Urostomy Supplies" without specifying the number of supplies that would be provided. (ECF No. 48-2, PageID.636). ACMO approval was given for an unspecified amount of urostomy supplies on 11/12/2020. (ECF No. 48-2, PageID.639). Hill and Doolittle both refused to comply with the previous prescriptions for urostomy supplies as mentioned above. They both failed to follow the prescribed treatment plan.

If both Hill and Doolittle would have complied with the orders of either Dr. Hafez or Dr. Asche, Clapper's addendum on September 28, 2021, for a minimum of ten changes per month for "quality of

life issues", would have been unnecessary.

Both Hill and Doolittle failed to follow the instructions/orders of an outside specialist and MDOC Medical Provider. See Weeks v Hodges, 871 F Supp 2d 811, 821 (N.D. Ind 2012) ("Evidence that a prison doctor has ignored an outside specialists instructions for a prison inmate is sufficient to survive a motion for summary judgment on a deliberate indifference claim.").

**OBJECTION # 4:**

DOOLITTLE

The Magistrate quoted Doolittle's Declaration in relation to extra urostomy supplies:

> "I also understand he alleges that on October 15, 2021, I refused to follow the recommendations of urologist PA-C Clapper for ten urostomy changes per month, and stated that, per NP Hill, if a leak occurred, he could have the unit officer call health care and receive an extra skin barrier and pouch." Doolittle Decl. (ECF No. 48-4, PageID.828)."

> \* \* \*

> "He also asked to have his details updated to allow three urostomy bags per week. I advised him that he was approved for two bags per week to keep on person (KOP), but he could come to medical at any time if he had a leak or needed it changed." Doolittle Decl. at PageID.830-31).
> \* \* \*

> "On September 30, 2021, I entered an administrative note summarizing the recent Urology findings. (Id. at 4331-32). I noted the patient told the urologist he was not receiving enough ostomy bags. but he received weekly ostomy bags and supplies and could come to medical at any time for replacement as needed if his supply was not sufficient. (Id.)." Dollittle Decl. at PageID.832.  (ECF No. 70, PageID.1111).

In conclusion on Doolittle, the Magistrate stated:

> "With respect to the urostomy supplies, NP Doolittle was faced with two recommendations from specialists outside of the MDOC (i.e., two changes per week vs 10 changes per month). (ECF 70. PageID.1112).

In Ashley's Verified Complaint, he lists the prescriptions that were issued for his ostomy supplies. Doolittle was faced with four

-13-

prescription choices: (1) Prescription issued by U of M Ostomy Nurses on 2/24/2016 (2 changes per week) (Complaint, ¶ 20); (2) Dr. Hafez's Prescription issued on 3/10/2016 (20 changes per month) (Complaint, ¶ 21); (3) Dr. Asche's Prescription on 4/16/2020 (up to 20 changes per month) (Complaint, ¶ 22); and (4) Clapper's prescription issued on 9/28/2021) (a minimum of ten changes per month for "quality of life issues") (Complaint, ¶ 71).

Doolittle followed none of these orders. See Weeks v Hodges, 871 F Supp 2d 811, 821 (N.D. Ind 2012) ("Evidence that a prison doctor has ignored an outside specialists instructions for a prison inmate is sufficient to survive a motion for summary judgment on a deliberate indifference claim.").


## OBJECTION # 5;

### ADA/RA CLAIMS

The Magistate stated that: "Plaintiff clarified that his ADA and RA claims are 'for a reasonable accommodation of two extra urostomy changes per month so he could participate in normal daily activities.' See Plaintiff's Response (ECF No. 64, PageID.1020)." (ECF No. 70, PageID.1112). The Magistrate then proceeded to evaluate Plaintiff's ADA/RA claim under a discrimination standard of review. ("To establish a prima facie case of intentional discrimination ..."). (ECF No. 70, PageID.1113).

Ashley has never claimed discrimination based upon his disability. Ashley's claim has always been for a "reasonable

accommodation". See Verified Complaint, pages 20-23; Plaintiff's Response (ECF No 64, PageID.1020) (pages 9-12).

The Magistrate acknowledged: "For purposes of this report, the Court will assume that plaintiff has a disability under the ADA." "That being said, the ADA does not create a remedy for plaintiff, because his claim is essentially a disagreement with his healthcare providers over medical supplies." (ECF No. 70, PageID.1115). The Magistrate cites cases that claim "the ADA and RA 'involve discrimination for an alleged disability and not medical treatment for that disability'); ("and ADA lawsuit 'cannot be based on on medical treatment decisions'"). (ECF No. 70, PageID.1116).

The Magistrate is correct that Ashley's "claim is essentially a disagreement with his healthcare providers over medical supplies." That statement is only half of Ashley's claims. It is true that Ashley was contesting the decision of healthcare about the amount of supplies he was receiving. That aspect of his claim is the deliberate indifference under the cruel and unusual provision of the Eighth Amendment. The second part of his claim, which is separate from the Eighth Amendment claim, is the ADA/RA claim. The AdA/RA claim is against the prison facility, or the entity MDOC, for refusing Ashley's request for a reasonable accommodation so he could equally participate in the programs or services offered by the prison facility and the MDOC. These are two separate claims against two separate departments, (i.e., healthcare and the prison facility/MDOC.). Ashley had been through the gamut with healthcare

and they refused to follow the prescriptions of previous providers. Ashley then sought relief from the prison facility and the MDOC, not as a review of the failure of healthcare to provide the requested urostomy supplies, but as a reasonable accommodation request for two extra urostomy changes per month from the facility/MDOC.

It is well-settled that a plaintiff can satisfy the Title II claim by demonstrating that Defendant failed to provide a reasonable accommodation necessary to permit him to participate equally in the relevant programs or services, in light of his disability. Jones v City of Detroit, Mich,20 F4th 1117, 1119 (6th Cir 2021) (citing Roell v Hamilton County, 870 F3d 471, 488 (6th Cir 2017).

"Two types of claims are cognizable under [ADA] Title II: claims for intentional discrimination and claims for a reasonable accommodation." Roell v Hamilton County, 870 F3d 471, 488 (6th Cir 2017).

If an ADA Title II plaintiff brings a claim for failure to provide a reasonable accommodation, then the court undertakes a different analysis than that used for intentional discrimination. A plaintiff alleging a failure-to-accommodate claim does not need to make the animus showing required to support a claim of intentional discrimination. Ability Ctr of Greater Toledo v City of Sandusky, 385 F3d 901, 909-10 (6th Cir 2004); Roell, 870 F3d at 488. Instead, "refusal to provide a reasonable accommodation can serve as direct evidence of disability discrimination." Keller v

-16-

Chippewa Cnty, Mich Bd of Comm'rs, 860 F App'x 381, 385 (6th Cir 2021) (citing Roell, 870 F3d at 488; Ability Ctr, 386 F3d at 907-08). This is because "[a] regulation implementing Title II requires a public entity to make "reasonable modifications" to its "policies, practices, or procedures" when necessary to avoid ... discrimination based on disability." Wilson v Gregory, 3 F4th 844, 859 (6th Cir 2021) (quoting Fry v Napoleon Cmty Schs, 580 US 154, 137 S Ct 743, 749, 197 L Ed 2d 46 (2017); see 28 C.F.R. § 35.130(b)(7)(i); see also Alexander v Choate, 469 US 287, 301-02, 106 S Ct 712, 83 L Ed 2d 661 (1985) ("[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made [pursuant to § 504]."). When a plaintiff shows that the proposed modification is needed to avoid the denial of services or benefits, the causation requirement is satisfied. Madej v Maiden, 951 F3d 364, 373 (6th Cir 2020). As a result, "the denial of meaningful access to medical care, bathroom facilities, or meals" through a refusal to make a needed modification "could support the required prima facie showing." Keller, 860 F App'x at 388.

As discussed above, to prevail on his failure-to-accommodate claim, Ashley must show that he is disabled, was otherwise qualified to receive prison services, and was denied access to prison services because of his disability. Ashley can survive summary judgment if he presents evidence that could allow a reasonable jury, resolving all differences in his favor, to conclude that the MDOC failed to make a reasonable accommodation

to provide him access to prison services. <u>Keller</u>, 860 F App'x at 385 (citing <u>Roell</u>, 870 F3d at 488; <u>Ability Ctr</u>, 385 F3d at 907-08).

A public entity denies a plaintiff access to government services "because of" their disability when it fails to provide a reasonable accommodation for their disability. <u>Wilson</u>, 3 F4th at 859; <u>Madej</u>, 951 F3d at 373. Ashley provided evidence showing that his requested accommodation was reasonable. (See Verified Complaint, pages 20-23).

On an ADA/RA claim, the plaintiff must show how the entity or its officials were deliberately indifferent. Under the ADA/RA, "The deliberate indifference standard 'require[es] both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood.'" <u>R.K. ex rel J.K. v Bd of Educ of Scott Cnty</u>, 637 F App'x 922, 926 (6th Cir 2016) (Moore, J., concurring in part and dissenting in part) (quoting <u>S.H. ex rel Durrell v Lower Merion Sch Dist</u>, 729 F3d 248, 263 (3d Cir 2013). "[I]t is enough that a plaintiff has given the public entity the information necessary to understand the need for and reasonableness of the rquested accommodation." <u>R.K.</u> 637 F App'x at 926.

Ashley has established the deliberate indifference needed for the MDOC's failure to provide a reasonable accommodation of two urostomy changes per month.

**OBJECTION # 6:**

## MEDICAL EXPERT TESTIMONY

The Magistrate conclusion was that:

> "The medical records reflect that NP Hill followed the treatment plan with respect to plaintiff's UTIs. Plaintiff has failed to provide any medical expert testimony to the contrary." (ECF No. 70, PageID.1109).
>
> * * *
>
> "The medical records reflect that NP Doolittle followed the treatment plan with respect to plaintiffs UTIs. Plaintiff has failed to provide any medical expert testimony to the contrary. (ECF 70. PageID.1112).

The Magistrate's reference to "medical expert testimony" refers to the standard outlined in <u>Phillips v Tangilag</u>, 14 F4th 524, 535 (6th Cir 2021). Ashley is not required to present such evidence in this case. The facts of this case are distinguishable from <u>Phillips</u>. The factual dispute at the center of this case is not a disagreement about adequacy of treatment in the same sense as <u>Phillips</u>. The central factual dispute here is that Defendant withheld prescribed treatment for nonmedical reasons (withholding D-Mannose due to the cost of cranberry juice; failure to follow the orders of previous providers regarding urostomy supplies; and withholding treatment of UTI's based solely on another providers (Clapper) recommendation). Because Ashley makes an allegation about an intentional change in treatment plan for nonmedical reasons, and Hill and Doolitte's complete reliance on Clapper's

recommendation without making a medical judgment themselves, "he need not provide expert medical testimony, which would not aid a factfinder in deciding his claims." See <u>Harp</u> <u>v</u> <u>Hallett</u>, 2024 U.S. Dist LEXIS 50503, * 6 (E.D. Mich March 21, 2024).

WHEREFORE, for the above reasons, Ashley requests this Honorable Court to reject the findings of the Magistrate's Report and Recommendation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 26, 2025.

Respectfully submitted,

CARL ASHLEY #136985
Pro se
Muskegon Correctional Facility
2400 S. Sheridan Drive
Muskegon MI 49442

Carl Ashley #136985
Muskegon Correctiobnal Facility
2400 S. Sheridan Drive
Muskegon, MI 49442

FIRST-CLASS



US POSTAGE ᴍᴇᴛ PITNEY BOWES

ZIP 49442    $ 002.72⁰
02 7W
0008040210 AUG 26 2025

CLERK OF THE COURT
U.S. District Court
113 Federal Building
315 W. Allegan Street
Lansing, MI 48933